MINNESOTA MUT. LIFE INS. CO. v. McINTOSH.

No. 8799.

Court of Civil Appeals of Texas. Austin.

March 8, 1939.

Rehearing Denied April 12, 1939.

Locke, Locke, Stroud & Randolph, Hubert D. Johnson and Maurice E. Purnell, all of Dallas, for plaintiff in error.

Woodruff & Holloway, of Brownwood, for defendant in error.

BAUGH, Justice.

Clyde McIntosh, beneficiary in a $2500 life insurance policy issued on the life of his brother, W. C. McIntosh, brought this suit against plaintiff in error, hereinafter designated as the Insurance Company, on said policy. The Insurance Company pleaded forfeiture for non-payment of premiums. In reply plaintiff pleaded waiver of such payment, and a course of dealing constituting an estoppel against the Insurance Company to set up non-payment of premium. Trial was to the court without a jury and judgment rendered for plaintiff for the amount of the policy, less the first year's premium; hence this appeal.

The policy involved was dated March 15, 1937, and McIntosh died December 9, 1937. It was written on a quarterly premium basis, providing for a cash payment of $21.91, and a similar sum payable in advance at the beginning of each quarter thereafter—that is, on June 15, 1937, and September 15, 1937. Since no premium was ever paid, and the judgment must be predicated upon waiver or estoppel, it will be necessary to set out, perhaps at undue length, what transpired between the insured, the local agent of the Insurance Company at Brownwood, its general agent at Fort Worth, and the home office of the Company at St. Paul, Minnesota, in order to fully comprehend and fairly discuss the issues presented.

The policy in question was issued on March 15, 1937, received by the local agent at Brownwood, on March 19, 1937, and by him delivered on that date to the insured. The insured then gave the local agent his check for $21.91, with instructions to hold it for a few days, and that he would notify such agent when it would be paid. The local agent was allowed 30 days after receipt of a policy in which to deliver it and collect the first premium. On April 19, 1937, not having been instructed by the insured to cash his check, the local agent took the matter up with McIntosh who on that day gave him a new check in lieu of the first one. This check was mailed by the local agent to the general agent at Fort Worth, who deposited it there on April 23rd, and remitted the "net" to the home office of the Company, which, on April 26th, credited the insured with payment of the first quarterly premium. The insured's check reached the Brownwood bank, on which it was drawn on April 24th, was dishonored and a protest fee of $2.40 charged, and the general agent at Fort Worth so notified. The general agent then wrote the local agent on April 26th of these

facts and instructed him to get in touch with McIntosh at once and have him either wire the money then due—$24.31—or send cashier's check immediately. The local agent so advised McIntosh who stated that he would take up this check within a few days. Again on May 1st the general agent at Fort Worth wrote the local agent at Brownwood that unless the amount of the check and the protest fee were in the Fort Worth office by May 5th, he would take the matter up with the home office and "clear this policy with the lowest possible charges. These charges will have to be paid by you." On May 3rd the local agent wrote the general agent that McIntosh had promised to make the check good in the next day or two, and asked that he be given until May 8th in which to do so. About this time McIntosh requested that the April 19th check be again presented for payment, which was done, and payment again refused. Having heard nothing further, the general agent, on May 12th, wrote the home office of the Company, stating what had transpired up to that time and requested instructions. The home office thereupon advised the general agent as follows: "Upon receipt of this letter you have to decide whether you wish the payment made to the Home Office to stand; if so, do not return the check to us. On the other hand, if you do not wish to pay this man's premium for him, which is what has happened, you should immediately send the unpaid check to us and we will reverse our entries and lapse the policy. There is no other alternative."

The general agent at Fort Worth thereupon sent the home office the dishonored check so that it could reverse its entries and cancel the policy, and on May 20th the home office wrote the insured as follows:

"Because this check was not honored when presented, the policy is not in force at this time and is of no value to you. If you wish to accept this good policy, a payment of $24.31 is necessary, the quarterly premium of $21.91 plus the protest fee of $2.40. You may make this remittance to the agent, J. A. Tibbetts, or direct to the General Agent, Mr. R. H. Pearson, 2112 Fort Worth National Bank Building, Fort Worth, Texas. Future Quarterly installments of this policy will be $21.91.

"If you do not feel that you are in a position to assume this insurance at this time, please return the policy to this office in the enclosed stamped envelope, together with a remittance for the protest fee, $2.40.

"We hope that you will decide to place this policy in force, but if not, we hope that you will not delay in returning the policy to us, together with your remittance to reimburse us for the amount of the protest fee charge."

This letter together with the dishonored check which was enclosed were duly received by McIntosh. On May 19th, however, the same day that the home office reversed its entries on its books, it mailed to the insured a notice that his second quarterly premium payment would be due on June 15th.

On June 21st the local agent again wrote the general agent at Fort Worth that McIntosh, though he had promised each week to do so, had never paid the first quarterly premium; that a second quarterly premium was then due; that he would see McIntosh that week and that "He will have to pay up or lapse out." Manifestly McIntosh did nothing because on July 3rd, the local agent again wrote the general agent at Fort Worth as follows: "Just lapse the McIntosh policy and charge me with the quarterly nets—I never could get him to redeem his hot check. He has 'sulled' on me—He avoids me on the streets now. I have talked with him so many times and he has made me so many promises I guess he feels ashamed—This is just another case where I trusted a man and got $21.91 worth of experience. * * *"

On July 7th the general agent at Fort Worth wrote McIntosh as follows: "With reference to your policy No. 295856, I have today written to our agent, Mr. J. A. Tibbetts, requesting that he kindly contact you within the next day or two. We would like very much, Mr. McIntosh, for this policy to remain in force. However, for it to do so, it will be necessary for you to pay two quarterly premiums of $21.91 each. If you do not care to do this then we request that you kindly surrender the policy to Mr. Tibbetts so that he might send it in for cancellation."

On the same day the general agent wrote the local agent at Brownwood advising him what he had written McIntosh and requested him to see McIntosh at once and either collect the two quarterly premiums or secure a surrender of the policy. The local agent did neither.

Up to the time, and in the light of the foregoing, it is clear, we think, that the Insurance Company through its general agent at Fort Worth could be held to have waived payment in advance of these quarterly premiums and to have treated the policy as still in force.

On July 9th, however, the home office wrote McIntosh a letter, copy of which was mailed to the Fort Worth general agent, with request that he solicit the local agent's assistance in securing surrender by McIntosh of the policy. This letter read, in part, as follows:

"Because your check in the amount of $21.91 tendered in payment of the initial quarterly premium due March 15, 1937, on the above numbered policy, was not honored when presented, we on the date of May 20, 1937, when returning that remittance to you, informed you that the policy was not in force and was of no value to you under those circumstances. We had hoped that you would send us a remittance of $24.31 and accept the policy, but in the absence of having a reply to our letter of May 20, 1937, we have no other alternative than to inform you that this policy is void. We have acted in good faith; won't you kindly return the policy in the stamped envelope sent to you with our letter of May 20, 1937.

"If you should later contemplate taking out a policy, we would be pleased to have you write us."

Pursuant to this letter the policy was cancelled on the records of the company on July 12th. On July 15th, after receipt of the letter of July 9th from the home office, McIntosh again wrote to the general agent at Fort Worth, stating that he wanted to keep the policy, giving further excuses for not having paid the quarterly premiums then past due, offering to make a 60-day note for the full premium, and stating that "if you do not care to do this I will return the policy."

This letter was not answered by the general agent but was by him sent to the local agent at Brownwood, with penciled notation added at the bottom of said letter by the general agent as follows: "Mr. Tibbets: We can not carry this note but if you write him and pay us the nets you could afford to on act of profit to you—Suggest if you do this that you take up old policy and write him a new one non-medical—Meby he could pay monthly."

This notation was made known to McIntosh by the local agent. While some further conversations seem to have occurred between McIntosh and the local agent, there was no further correspondence about the matter between either McIntosh or the local agent and the home office of the Company or its general agent at Fort Worth, no further notices given the insured by the Company, and no payments of any sort ever made by McIntosh. The local agent at no time appears to have ever expressly demanded of McIntosh the surrender of the policy, nor did he demand or undertake to collect the third quarterly premium which, under the terms of the policy, would have been due on September 15th prior to McIntosh's death on December 7th.

It seems clear that from the local agent's letter of July 3rd, he then considered that so far as he was concerned the matter of the validity of McIntosh's policy was at an end. While the letter from the general agent at Fort Worth to McIntosh on July 7th would indicate that he did not then consider the policy void, its continuation in force was made dependent upon the payment by the insured of two quarterly premiums. So far as the Insurance Company was concerned, its letter to McIntosh dated July 9th, was an unequivocal and unconditional notice to the insured that his policy was then void. This was its status at the time McIntosh wrote the general agent at Fort Worth on July 15th offering to execute his note to the Company for the first year's premium. Had the general agent merely ·rejected that· offer, in the light of what had already transpired, we think there could be no doubt but that the matter would have then been entirely closed.

Can the penciled notation by the general agent to the local agent on insured's letter of July 15th to the general agent, combined with the negotiations between the local agent and McIntosh, when taken in connection with what had transpired prior to that time, be construed as a waiver of forfeiture? We have reached the conclusion that they cannot.

 Under the terms of the application and of the policy, the insurance was not to become effective until the first premium was paid. And the giving by the insured of a worthless check, unless unconditionally accepted as such, does not constitute such payment Texas Mutual Life Ins. Ass'n v.

Smartt, Tex.Sup., 114 S.W.2d 528, 529, and cases therein cited. And under the terms of the policy here involved, failure to pay the premium when due ipso facto worked a forfeiture thereof, unless the Company waived such forfeiture. Numerous cases have been written on what amounts to a waiver of forfeiture, and it is unnecessary to discuss or review them here. A comprehensive and illuminating discussion of the subject was made by Justice Phillips in Equitable Life Assurance Soc. v. Ellis, 105 Tex. 526, 147 S.W. 1152, 1157, 152 S.W. 625. In order to sustain a waiver the following essential elements must appear: 1. There must have existed a valid policy on the life of the insured; 2. A failure by, the insured to pay a premium thereon when same became due; and 3. Some act, or course of dealing, by the insurer or by its authorized agent, "by which the insurer recognizes the continued validity of the policy or does acts based thereon."

■ It is clear, we think, that up to July 9th, as shown by the correspondence quoted, the facts were sufficient, had the insured died during that period, to show a waiver of forfeiture. But on July 9th the Insurance Company itself unequivocally declared a forfeiture, so notified the insured, and requested a surrender of the policy. So far as the home office of the Company was concerned, it thereafter did nothing to indicate either a reinstatement of the policy or any intention to treat it as still in force. No notice was given to the insured by the Company or by any agent that the quarterly premium, which under the terms of the policy would have been due on September 15th, must be paid. The policy was duly cancelled on the books of the Company on July 12th, and so far as any act on the part of the home office was concerned, the matter was then closed, and both the general agent at Fort Worth and the local agent at Brownwood were so notified.

The only matters which may be considered, therefore, on the issue of waiver, was what transpired subsequent to that date. And it may here be observed that in none of the cases cited and relied upon by appellee, was there any express declaration by the insurance company itself of an unequivocal forfeiture of the policy in issue, such as is presented here. It must be remembered also that at the time McIntosh wrote the general agent on July 15th, offering to give his note for the entire annual premium, his policy was then void under its own terms and the express notice to that effect by the company itself. It follows, therefore, that unless the Company accepted his proffer in that letter, it could not in any event be revived. While the general agent did not reply to this letter, even the penciled notation made thereon in forwarding it to the local agent, cannot be construed as any acceptance, or willingness on the part of the general agent, who then knew that the policy had been forfeited by the Company itself, to accept such payment. And in the light of what the general agent then knew, and of the notice given to the insured himself in the letter of July 9th, we think the clear interpretation of the general agent's notation to the local agent could not be construed to refer to the policy already forfeited; but that the language "but if you write him and pay us the nets, you could afford to, etc," take the insured's note, manifestly meant the issuance of a new policy. Otherwise the suggestion, "if you write him," becomes meaningless, because the local agent had already long since "written" him on the policy in question. That being true this notation is no indication of any intent to waive the already declared forfeiture under the terms of the policy itself. And nothing whatever was shown to have been done by the Company or by its general agent subsequent to September 15th to indicate any intention on the part of the Insurance Company to waive the ipso facto forfeiture which would have occurred on that date to pay the quarterly premium then due, had the policy not already been terminated prior to that time.

Under these facts and circumstances it was immaterial what the insured may have thought about the validity of such policy. He had express notice from the Company that it was void in his hands. The language of Judge Phillips in the Ellis case on the question of waiver is here pertinent: "Ellis had no power to waive the forfeiture, and his conduct or mental condition could have no probative force upon the question as to what the company did or intended to do, or upon the effect to be given its action."

■ The conversations between the insured and the local agent, who was a special agent with authority limited to taking applications, delivering policies, and collecting the first premiums, after the pol-

1036

icy hád. been. declared void manifestly would not bind the company unless it knew of such convèrsation, acquiesced therein with 'such knowledge, or did some act ratifying same. Under the agent's contract, the terms of the application, of the policy itself, and the provisions of Art. 5063, R.S.1925, such agent had no authority to waive, change, or alter any terms of the application or the policy. Sanchez v. American Nat. Ins. Co., Tex.Civ.App., 40 S.W. 2d 240; Bankers Lloyds v. Montgomery, Tex.Com.App., 60 S.W.2d 201; American Nat. Ins. Co. v. Huey, Tex.Com.App., 66 S.W.2d 690. And the insured was charged with notice of the limitations on the local agent's authority prescribed by Art. 5063, R.S., and stated in the policy. Donaldson v. National Life & Acc. Ins. Co., Tex.Civ. App., 53 S.W.2d 136; Rio Grande Nat. Life Ins. Co. v. Bandy, Tex.Civ.App., 110 S.W. 2d 122. This applies with equal force to the authority of the local agent, without the consent of the Company, to extend credit to the insured for the first premium on said policy; and to any statement made by such local agent to the insured after forfeiture that so long as the insured had possession of the policy it would still be in force. Nor did the failure of the local agent to demand a surrender by the insured of .the policy constitute any evidence of waiver. He had been notified by the Company that his policy was void and its surrender requested. The general agent was so notified and requested the local agent to secure such surrender. Consequently the failure of the local agent to do so could not, as against the Company, give it any binding force whatever.

It is manifest from the facts stated that the Insurance Company was not estopped to assert forfeiture. If the elements of estoppel, independent of the question of waiver, are present they would appear to operate against the insured, rather than against the Company. Not only did the Company indulge the insured, in its efforts to collect from him premium installments after they were due, beyond the terms of the policy; but the insured not only failed to pay any premium on the policy, but failed to carry out any of his promises to do so. Under the record presented the conclusion is inescapable, in our opinion, that the policy sued upon was void at the time of the insured's death; and that the Company had not waived a forfeiture for non-payment of premium thereon. The case appears to have been fully developed and no reason ap-

pears for reversing and remanding it for another trial. The judgment of the trial court is therefore reversed and judgment here rendered for appellant.

Reversed and rendered.