**PACIFIC FINANCE CORPORATION et al.,
Appellants,**

**v.**

**Jane Wylie MOODY et al., Appellees.**

**No. 10247.**

Court of Civil Appeals of Texas.

Austin.

Oct. 27, 1954.

Rehearing Denied Nov. 17, 1954.

Irion, Cain, Bergman & Cocke, Neil Brans, Dallas, for appellant Pacific Finance Corp.

Weatherred, Geary & Shelton, Dallas, for appellant Old Republic Credit Life Ins. Co.

Senterfitt, Crump & Jameson, San Saba, for appellees.

GRAY, Justice.

This suit was instituted by Jane Wylie for herself and as next friend for her minor daughter, Becky Wylie, against C. C. Collier, Collier Company, Inc., D. A. Long, Pacific Finance Corporation (later called Pacific) and Old Republic Credit Life Insurance Company (later called Republic). The purpose of the suit was to recover upon a policy of credit life insurance issued by Republic.

It was alleged that Jane Wylie acting as agent for her husband, Charles Edward Wylie, applied to C. C. Collier and Collier Company, Inc. to finance the purchase of an automobile and for a policy of credit life insurance covering the indebtedness of Charles Edward Wylie due to the purchase of said automobile, and that C. C. Collier and Collier Company, Inc. acting as agent for Pacific and Pacific as agent for Republic by mistake issued such policy in the name of D. A. Long instead of in the name of Charles Edward Wylie.

It was alleged that Charles Edward Wylie died prior to the filing of this suit and that Jane Wylie and Becky Wylie are his survivors.

After this suit was filed Jane Wylie married Jack Moody who joined her as a party plaintiff.

All parties answered and the cause was tried to a jury. The trial court included in his charge to the jury a definition of the terms "agent" and "special agent." In answers to special issues the jury found: (1) Jane Wylie was acting as agent for Charles Edward Wylie at the time the application to finance the automobile, and the application for credit life insurance

were made; (2) that she was acting within the scope of her agency; (3) that on the occasion in question C. C. Collier was acting as special agent for Pacific; (4) that at such time he was acting within the scope of his special agency; (5) that C. C. Collier agreed with Jane Wylie that the policy of credit life insurance would be on the life of Charles Edward Wylie; (6) that the failure of the insurance policy to contain the name of Charles Edward Wylie as the insured was caused by the mutual mistake of C. C. Collier and Jane Wylie; (7) that on the occasion in question C. C. Collier and Jane Wylie agreed that Charles Edward Wylie would be liable for the payments on the automobile. There are no issues 8 and 9. By further answers to special issues the jury found: (10) that between October 6, 1952, and December 12, 1952, plaintiffs did not accept the certificate of insurance as issued (by Pacific); (11) that plaintiffs and D. A. Long by the cause of their conduct between October 6, 1952 and December 12, 1952, did not lead defendants to reasonably believe that they had no complaint to the insurance on the life of D. A. Long. Issues 12, 13 and 14 were conditionally submitted and were not answered. By their further answers the jury found: (15) that C. C. Collier forwarded proof of loss and notice of death of Charles Edward Wylie to Pacific, and (16) that Pacific did not forward proof of loss and notice of death of Charles Edward Wylie to Republic.

The trial court overruled the motions of Pacific and Republic for judgment non obstante veredicto and rendered judgment against them, jointly and severally, for the amount of the alleged indebtedness. Pacific and Republic have appealed.

The evidence shows that Jane Wylie and her husband Charles Edward Wylie resided in the State of New Mexico but were in Goldthwaite on a visit and desired to purchase an automobile. Pursuant to this purpose they drove and tried out an automobile offered for sale by C. C. Collier or Collier Company, Inc. No sale was consummated and Charles Edward Wylie returned to New Mexico where he was employed. However, before leaving he gave money to D. A. Long with which to make a down payment on an automobile. Shortly thereafter Jane Wylie and her father, D. A. Long, purchased an automobile from Caruthers Motor Company in Goldthwaite and applied to C. C. Collier or to Collier Company, Inc., of which company C. C. Collier was president, to finance the balance of the purchase price of the automobile and for credit life insurance. (It appears that at the time a health and accident insurance policy on Charles Edward Wylie was applied for together with comprehensive coverage on the automobile.) This application resulted in the balance of the purchase price being financed by Pacific and a certificate of credit life insurance being issued by it.

Pacific had a contract with Republic which was a group creditor's or master policy which authorized Pacific to insure the lives of its creditors only. Under this contract Pacific issued a certificate of insurance to its debtors on applications made therefor.

At the time of the above transactions Charles Edward Wylie was a minor.

The above transactions were had on October 6, 1952, and on December 12, 1952, Charles Edward Wylie met accidental death at which time he had made one payment on the indebtedness to Pacific.

After his death it was first learned by Jane Wylie and D. A. Long that the certificate of credit life insurance was issued on the life of D. A. Long and not on the life of Charles Edward Wylie.

The title certificate to the automobile was issued to Jane Wylie on her application. This application was made in the office of, and was filled out by, C. C. Collier.

Jane Moody, originally Jane Wylie, testified that her father D. A. Long went with her to C. C. Collier's office and

"Q. Now, state whether or not at the time you talked to Mr. Collier you signed an application for credit life insurance? A. I did.

"Q. Just state to the jury what happened on that occasion? A. Mr. Collier filled out an application for the life insurance, with this company, I suppose. He said or rather he asked me all about where Charles worked and how much he made, where he had previously worked, and if we could pay Seventy Five Dollars a month on the car. Then he asked me to sign Charles Ed's name at the bottom. He filled out the application in Charles Ed's name.

"Q. State whether or not you signed Charles Ed Wylie's name at the bottom of this application? A. I did, sir.

"Q. Do you know whether or not you signed your own name at that time? A. I signed my own name on the application for the certificate of title to the car.

" *     *     *     *     *     *.

"Q. I will ask you this, Mrs. Moody, state whether or not C. C. Collier at that time stated to you that this insurance would be issued upon the life of Charles Ed Wylie? A. He did tell me that Charles Ed Wylie would be insured.

" *     *     *     *     *     *

"Q. And just what papers were signed you don't recall or do you? A. I signed the title for the certificate and my father signed under me because I was too young to sign for a car myself, and my father signed under me on that. Then my father signed about this note and I signed the application for the insurance on Charles.

"Q. Now, at the time the necessary notes, mortgages and whatever was executed at that time were made, did Mr. Collier—was he told or did he understand that it was to be the obligation of you and your husband? A. He did."

D. A. Long testified:

"A. And we went in there and asked for Fifteen Hundred Dollars at Collier's Finance, Fifteen Hundred Dol-

lars, and he said all right. I told him that my daughter was with me and I said she can put the certificate of title in her name, it wouldn't make any difference, she was there with me, and so he wrote the certificate of title out, he wrote Jane Long Wylie, and she was a housewife, and right under it he wrote, Charles Ed Wylie, Eunice, New Mexico, working for the New Mexico Electric Company, and drawing $350.00 a month, and who he had previously worked for, that was Hollis Blackwell and the Santa Fe, and he asked how old he was and I told him he was twenty years old. Then he asked if I would sign his note and I told him that I would. After that he said that he had sold, Collier said that he had sold cars to boys that didn't take out life insurance, and he said that they could lose them, and then he said that for around Fifty Dollars more he could insure Charles Ed Wylie and if he gets hurt and was off of that job for fourteen days that they would pay the Seventy Five Dollars a month and if he gets killed or died then they will cancel it. Then I said well, he has got a dangerous job and I am going to cover him.

" *     *     *     *     *

"A. Well, after that he made up the application for this insurance and he wrote Charles Ed Wylie's name down there and he gave his description down there, who he worked for and where he had worked before and how much money he was making, and then my daughter signed his name at the bottom. My name was not on it at all.

"Q. State whether or not Mr. Collier at that time told your daughter that the life insurance policy would be issued upon the life of Charles Ed Wylie? A. He did.

"Q. At the time you were in there was there ever any agreement or anything said between any of you about insuring your life? A. No, sir, nothing mentioned.

"Q. State whether or not you or Mrs. Wylie told Mr. Collier at that time that this was to be the obligation of Mr. and Mrs. Wylie? A. Yes, sir, we certainly did.

"* * * * * *

"* * * When I struck Collier that Monday morning he told me that he had another car over there that he would like to sell Charles Ed Wylie and I told him that I had bought him a new Plymouth over there and then he said well, if he hasn't got money enough to pay for it I would like to finance it for him. I told him all right, that I would talk to my daughter and that if it was satisfactory to her that we would come over there and talk to him, and so we went over there and talked to him.

"* * * * * *

"Q. Did Collier say who would be responsible for it? A. Well, when he wrote that application out on Charles Ed, he said that Charles Ed would be responsible for it, that he was the man to pay for the car."

D. A. Long also said that certain instruments, exhibited to him, were received by him through the mail and that he then went to see C. C. Collier and asked him:

"* * * how come these papers were sent to me instead of to Charles Ed Wylie. Then he said, you go stick those papers up and keep them, the reason that we sent them to you was to make Goldthwaite Charles Ed Wylie's home address. Then he said, he can take the car and work anywhere he wants to. So I taken his word for it and I taken them home and I stuck them up and I did not open those papers until after his death."

After Charles Edward Wylie's death D. A. Long delivered the above mentioned instruments to C. C. Collier and subsequently received a letter from Pacific dated December 19, 1952, which in part is:

"In reviewing your contract, you will recall that (at) the time of the sale that Mr. Collier was instructed by you to put the title to the car in you and your daughters name. I'm sure that you had reasons of your own for this action.

"You will recall that you had to sign the contract because we would not accept a contract in a married woman's name. This of course put you as the person legally responsible for the payments on this contract even though your son-in-law was to drive the unit and to make the payments. Naturally since you are responsible for the payments, Pacific Finance had to place the insurance (Life, Accident & Health) on you. Therefore this contract is still in force and can in no way be cancelled by this unfortunate accident."

C. C. Collier testified and related taking the application on forms furnished him by Pacific and said:

"A. I believe after they (Pacific) had received the copy of this contract they called me in regard to the principal on this thing and as far as the insurance was concerned. In the meantime Mr. Long had asked me who was insured and I had told him that frankly I did not know but that it was my opinion that both parties would be insured, but that I would look into it and find out. I did check on it and I found that in the opinion of the Brownwood office both parties were insured and at that time they gave me instructions not to take any more co-signers.

"Q. Now, by both parties do you mean Jane Long Wylie and Mr. D. A. Long? A. Yes, that's right."

Further he related his method of dealing with and for Pacific; that he took applications for Pacific and that it determined whether or not it would accept applications forwarded to them by him. He testified that he took the information relative to Charles Edward Wylie because "they had

told me that Charles Ed Wylie was going to make the payments on the car," and understood that he and Jane Wylie were to be responsible on the note.

There is no evidence offered by Pacific denying the agency of C. C. Collier.

Charles Holdman, regional manager for Republic, testified that Republic issued to Pacific a master policy which entitled it to insure the lives of its debtors, and that forms are supplied to Pacific for completing a claimant's proof of death and that "Pacific would put up their claimant's proof of death and mail it to us. Upon receipt of that we pay the claim if that particular party is a debtor of the policyholder."

Republic offered no evidence denying the authority of Pacific to issue the certificate of insurance in question. This, under the evidence, was an undisputed issue and was not submitted to the jury.

Appellees' pleading contained an allegation that Jane Wylie was the duly authorized agent for Charles Edward Wylie and that she acted within the scope of her agency and that C. C. Collier and Collier Company, Inc. were the agents for Pacific and were acting within the scope of his and its authority. There was no pleading that any one was a "special" agent for any other person. There has not been called to our attention any special exception directed to the pleadings for such omission.

Objections were made in the trial court by Republic to the submission of the definition of special agent to the jury because there was no pleading that any party was the special agent for any other party, and Pacific makes the same objection here. Also objections were and are made to the the submission of issue 3 because there were no pleadings and no competent evidence to support such issue.

The pleadings were sufficient to give fair notice to appellants that appellees were asserting the representative capacity of C. C. Collier. This is the requirement of Rules 45 and 47, Texas Rules of Civil Procedure.

In a statement of the requirements of pleadings under our present rules of Civil Procedure, McDonald's Texas Civil Practice, Vol. 2, Sec. 5.07, on page 491, it is said:

"Rules designed to produce 'certainty in the issues' developed by written pleadings likewise lose some of their former force. What is now required is not so much certainty in the issues as certainty in the incident: the time and place of the transactions involved and the circumstances of the occurrence which forms the basis of the controversy are to be stated with such particularity as will permit the opponent to identify the source and estimate the general scope of the dispute."

■ Without objections as to the insufficiency of the pleadings evidence was heard which showed that Pacific furnished printed forms to C. C. Collier for the purpose of taking applications for insurance and to forward the same to Pacific for its approval or disapproval. If the application was approved then Pacific issued a certificate of insurance under its master policy with Republic. In the transactions in question here this procedure was followed and the application for insurance was accepted by Pacific. These facts would constitute C. C. Collier the agent for Pacific. Vernon's Ann.Civ.St., Insurance Code, art. 21.-04. Under this article, and the facts, C. C. Collier had no authority to waive any of the terms or conditions of the application or the insurance. Under these conditions C. C. Collier was a special agent. Minnesota Mut. Life Ins. Co. v. McIntosh, Tex. Civ.App., 126 S.W.2d 1031, error dism. judgm. cor.

■ There is no contention here that C. C. Collier acted beyond his authority. Under the facts before us the general law of agency is applicable and C. C. Collier was authorized to do all things incidental and necessary to carry out the purpose of his agency. The term "special agent" is for all practical purposes here no more than a gauge by which to measure the authority of C. C. Collier. Sec. 2, Tex.Jur., Sec. 22,

p. 406. Appellants have not shown that they suffered harm by reason of the giving of the definition complained of or by the submission of special issue 3. Of course at the time the objections to the definition and the special issue were made appellees could have filed a trial amendment. Rule 67, Texas Rules of Civil Procedure. However we think the error complained of, in any event, does not amount to such a denial of the rights of appellants "as was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case * * *" and that a reversal of the trial court's judgment would not be proper. Rule 434, Texas Rules of Civil Procedure.

 The evidence, supra, was sufficient to raise issue 4 and to support the jury's finding that C. C. Collier was acting within the scope of his special agency for Pacific.

Appellants argue that agency cannot be established by the testimony of the agent and direct their arguments to the jury's findings as to the agency of C. C. Collier and Jane Wylie. (Issues 1 and 3.) While agency cannot be established by the ex parte statements of the agent an alleged agent may testify under oath at the trial as to the facts of his or her agency. Steptore v. San Antonio Transit Co., Tex.Civ. App., 198 S.W.2d 273; Meier v. Service Corporation of National Ass'n of Credit Men, Tex.Civ.App., 129 S.W.2d 690, error dism., judgm. cor. 2 Tex.Jur. p. 538, Sec. 137. Moreover there is other evidence, noted supra, relative to the acts of C. C. Collier and Jane Wylie tending to establish their alleged agencies and it was proper to leave the question of agency to the jury. 2 Tex.Jur., p. 527, Sec. 127.

The policy of insurance issued by Republic to Pacific is authorized by V.A. T.S. Ins. Code, art. 3.50, Sec. 1, subsection (4), section (d), of which provides:

"The insurance shall be payable to the policyholder. Such payment shall reduce or extinguish the unpaid indebtedness of the debtor to the extent of such payment."

The testimony, supra, supports the jury's finding of mutual mistake. Issue 6.

We conclude that the jury's findings are supported by competent evidence and together with the undisputed relation of Republic to Pacific supports the judgment rendered by the trial court.

The judgment of the trial court is affirmed.

Affirmed.