514 So.2d 814 (1987)
Kennie J. SPEARS and Handy Wilson, Jr.
v.
COLONIAL BANK OF ALABAMA, Colonial Banc Corporation, and Jim Burke Buick, Inc.
85-857.
Supreme Court of Alabama.
June 19, 1987.
Rehearing Denied September 18, 1987.
Leo E. Costello, Birmingham, for appellant.
Susan B. Mitchell and Michael A. Anderson and Stanford J. Skinner, Birmingham, for appellee.
PER CURIAM.
This case originated as a class action against Colonial Bank of Alabama and Colonial *815 Banc Corporation (both hereinafter referred to as "Colonial Bank"), and Jim Burke Buick, Inc. ("Jim Burke"), for alleged violations of the Alabama Mini-Code (Code 1975, § 5-19-1, et seq.); for alleged improper credit of insurance premium refunds; and for alleged conversion. The named plaintiffs, Kennie J. Spears and Handy Wilson, Jr., sought to represent a class of all individuals who had purchased automobiles from Jim Burke, the purchases of which, along with premium payments for credit life and credit disability insurance, were financed by Colonial Bank.
The plaintiffs allege that Jim Burke required them to purchase credit life and diability insurance in order to purchase the automobiles, and that the price of this insurance exceeded the premium charged by the insurance company, all in violation of § 5-19-20. In essence, they contend that Jim Burke's receipt of a commission of 50 percent of the premium from each sale of credit insurance was in violation of the Mini-Code.[1]
Spears and Wilson, individually, allege that property damage insurance interest refunds were improperly credited by Colonial to Jim Burke's reserve account; that, as to Wilson alone, Jim Burke misrepresented the odometer reading on the automobile purchased by him; and that, as to Spears only, Colonial Bank wrongfully converted a $426 insurance refund owed to him.[2]
Colonial Bank and Jim Burke filed motions for summary judgment on each of the plaintiffs' claims and a motion to dismiss all class-action claims. The circuit court entered two separate orders on the defendants' motions.
The first order dealt with only one issue:
"Whether or not Jim Burke Buick was entitled to charge or receive a commission on the credit life insurance, credit disability insurance, and property insurance it sold to the named Plaintiffs in conjunction with loans the named Plaintiffs obtained from the Defendants."
The trial court ruled that § 5-19-1, et seq., does not "prohibit car dealers or other companies making loans covered by such sections from receiving commissions on the various types of insurance allowable under § 5-19-20, so long as all other provisions of those sections are met."
The court held that the premiums charged to the named plaintiffs were within the amounts allowed by the applicable statutes, rules, and regulations. It found, therefore, that Colonial Bank and Jim Burke were entitled to summary judgment on this theory of the plaintiffs' claims. The court also found that Colonial Bank's and Jim Burke's motions to dismiss all class-action claims were due to be granted, because the only issue supportive of the class certification was decided adversely to the plaintiffs by summary judgment.
By separate order, the trial court rendered summary judgment in favor of the defendants on all remaining claims, except the plaintiffs' claims that Jim Burke required the plaintiffs to purchase insurance and that Jim Burke misrepresented the mileage on the automobile purchased by Wilson. These claims remain pending against Jim Burke. The summary judgments granted in favor of the defendants were made final pursuant to Rule 54(b), A.R.Civ.P., and the plaintiffs appeal.
In summary, then, we discern from the pleadings, the orders of the trial court, and the briefs and arguments of counsel that the only dismissed claims here presented for review are the plaintiffs' claims for wrongful payment of commissions in violation of the Mini-Code.
We hold that the trial court did not err in its determination that § 5-19-20(a) does not prohibit Jim Burke, as a creditor, *816 from receiving a commission on its sale of insurance to the plaintiffs, as debtors.
Jim Burke had arrangements with various insurers, whereby, for every policy sold to its customers, it would remit the entire premium to the insurer.[3] Thereafter, for each credit life and disability policy sold, the insurer would compensate Jim Burke by payment of a sum equal to 50 percent of the premium costs, a payment which plaintiffs contend is more correctly characterized as an illegal kickback, rather than a commission. They contend that § 5-19-20(a) prohibits a creditor from charging more than the actual coverage costs, and that only 50 percent of the premium actually paid represented the full amount charged by the insurer.
Colonial Bank states, and the record bears out, that, while its loans to the plaintiffs included the premium payments, it did not receive a commission. Jim Burke argues that the Mini-Code, and regulations promulgated pursuant thereto, permit receipt of a commission on the sale of credit insurance. It contends that the plaintiffs' definition of "premium," which would exclude commissions made thereon, is strained. Further, Jim Burke points out that § 5-19-21 provides that an "administrator is authorized and empowered to make such reasonable rules and regulations as may be necessary for the execution and enforcement of the provisions of this chapter," and that the insurer and Jim Burke relied on these rules and regulations in setting rates for credit insurance.
The plaintiffs urge us to consider this case in light of the underlying tenor of the Mini-Code, which is that of consumer protection. The plaintiffs' premise is correct. Derico v. Duncan, 410 So.2d 27, 31 (Ala.1982) ("the provisions of Code 1975, § 5-19-1, et seq., `Consumer Finance,' known collectively as the Mini-Code, are regulatory in nature and are for the protection of the public, specifically, the consumer/debtor"). Thus, construction of the statute in this case must be made with the protection of the consumer in mind.
Section 5-19-20 provides, in pertinent part:
"(a) With respect to any credit transaction, the creditor shall not require any insurance other than insurance against loss of or damage to any property in which the creditor is given a security interest or insurance insuring the lien of the creditor on the property which is collateral for said transaction. Credit life and disability insurance may be offered and, if accepted, may be provided by the creditor. The charge to the debtor for any insurance shall not exceed the premium charged by the insurer. Insurance with respect to any credit transaction shall not exceed the approximate amount and term of the credit." (Emphasis added.)
The key to this Court's consideration of whether § 5-19-20 was violated is a determination of the meaning of "premium." There being no definition of "premium" in the Mini-Code, we look to the case law. In Reid v. United Security Life Ins. Co., 290 Ala. 253, 256, 275 So.2d 680 (1973), the Court defined "premium" as "the amount paid to the insurer by the insured for the insurance," and the Court added, "`Premium' has been defined as the sum which the insured is required to pay, and in its proper and accepted sense it means the amount paid to the company as consideration for insurance." Thus, because it is a cost of procuring the insurance, a premium may include the commission paid to the seller of the insurance.
The Alabama State Banking Department has promulgated rules and regulations establishing and authorizing the maximum single premium rates for credit life insurance and credit disability insurance. The superintendent of banks of the state banking department is empowered to make such rules and regulations as are reasonably necessary for the execution and enforcement of the provisions of the Mini-Code, *817 pursuant to § 5-19-21. All parties agree that the premiums charged to the plaintiffs for the various insurance coverages were within the lawful maximum rates established by the state banking department.
Because the premiums charged to the plaintiffs, as debtors, were within the maximum lawful rates, there has been no cognizable violation of the Mini-Code, nor of the rules and regulations promulgated pursuant thereto. Absent any evidence to support the claim that § 5-19-20(a) was violated, we find no error requiring reversal of the defendants' summary judgment on the payment-of-commissions issue. Thus, it is axiomatic that the trial court did not err in granting the defendants' motions to deny class certification on this theory of the plaintiffs' claims.
AFFIRMED.
MADDOX, ALMON, SHORES, ADAMS and STEAGALL, JJ., concur.
JONES, J., concurs specially.
BEATTY, J., recused.
JONES, Justice (concurring specially).
I concur in the opinion affirming the summary judgment on the plaintiffs' claims based on the defendants' alleged violations of the Mini-Code. I write separately to express my concern that we may have overly narrowed the intended scope of the trial court's ruling. The record is not entirely clear whether the trial court intended its partial summary judgment to embrace an additional claim on behalf of each of the plaintiffs.
Paragraph 14 of the plaintiffs' amended complaint states:
"Plaintiffs allege that Colonial and Jim Burke each, separately and severally, had a duty to advise Plaintiffs ... of the fact that insurance of the nature imposed upon Plaintiffs and routinely sold to Plaintiffs ... was sold at a price far in excess of amounts which Plaintiffs would have to pay elsewhere."
The trial court's two separate orders addressed separately each of the plaintiffs' asserted claims, except the claims set out in paragraph 14, denied the defendants' summary judgment motions as to "the allegation that Jim Burke required the plaintiffs to purchase the insurance, and the allegation by the plaintiff, Handy Wilson, that Jim Burke misrepresented the mileage on the automobile that he purchased," and granted the motions "on all the remaining claims against [both defendants]."
The plaintiffs devote only two paragraphs of their brief to the breach-of-duty claims. Jim Burke's brief argues only the alleged Mini-Code violations, contending that none of the other claims asserted below is relevant to this appeal. On oral argument, the plaintiffs limited their presentation to the Mini-Code issue, apparently conceding Jim Burke's position with reference to the sole relevant issue presented for appellate review.[1]
It is conceivable, even probable, that the trial court perceived the plaintiffs' "paragraph 14" allegations as merely supplemental to their claims that Jim Burke required the plaintiffs to purchase the insurance (these claims are still pending below). At any rate, such an interpretation is consistent with the trial court's order addressing specifically the claims on which it granted summary judgment and with Jim Burke's contention that the Mini-Code claims are the only relevant claims here presented.
Nevertheless, because we may have misread the scope of the trial court's summary judgment, I deem it appropriate to address the "agency relationship" issue.
The plaintiffs' arguments as to the problems inherent in the sale of credit insurance are well taken. The fact that the creditor is allowed compensation under the language of § 5-19-20 results in a clear probability of expensive credit insurance for the consumer. As pointed out in *818 Fonseca, Handling Consumer Credit Cases § 12:10, pp. 494-99 (1986), because insurers compete against each other to place their business with creditors, the creditor is in a position to choose the insurer that offers it the highest compensation for every dollar of insurance sold. "Since Consumer has no voice in determining these rates, and since he is a non-shopping `captive' in the sense that the sale of insurance will only come up as an incidental matter after the credit transaction is completed, the premium rate has been set high by `reverse competition.'" Fonseca, at 495-96.
These observations notwithstanding, however, Jim Burke's liability, if any, under general agency law, can only be determined once its status as an insurance "agent" or as an insurance "broker" is ascertained.[2]
Section 27-8-1 defines "agent" and "broker"[3]:
"(a) An agent is a natural person, partnership or corporation appointed by an insurer to solicit applications or to negotiate for insurance or annuity contracts and to deliver policies or contracts on its behalf and, if authorized to do so by the insurer, to collect premiums in connection therewith.
". . . .
"(c) An insurance broker is any individual, partnership or corporation who, for compensation, not being a licensed agent for the company in which a policy of insurance is placed, acts or aids in any manner in placing risks or effecting insurance for a party other than himself or itself. An individual, partnership or corporation not licensed as an insurance broker who solicits a policy of insurance to or on behalf of others or transmits for others an application for a policy of insurance to or from an insurance company or offers or assumes to act in the negotiations of such insurance shall be an insurance broker within the intent of this chapter, and shall thereby become liable for all the duties, requirements, liabilities and penalties to which such licensed brokers are subject."
Generally, agents and brokers have been distinguished by the fact that an insurance agent is "one employed by an insurance company to solicit risks and effect insurance," while a broker "is one who acts as a middleman between [the] insured and the company; one who solicits contracts from the public under no employment from any special company, but [who,] having secured an order[,] places the insurance with the company selected by [the] insured, or, in the absence of any selection by him, with the company selected by such broker." 44 C.J.S. Insurance § 136, at 797 (1945).
The question of whether a person is an insurance agent or is a broker is generally determined by his acts. But categorizing the creditor that procures credit insurance for its customers, primarily to protect the creditor from loss, is not so easily done. The creditor that procures such insurance presents a unique situation. There is authority for finding that the seller of goods is regarded as acting as the agent of the insurer. 3 Couch on Insurance 2d § 26:127, pp. 752-53 (1984). Where such is held, however, the rule usually protects the debtor/consumer in actions between the insured and the insurer. See Strait v. Ray North, Inc., 343 Mich. 130, 72 N.W.2d 39 (1955); Pacific Finance Corp. v. Moody, 272 S.W.2d 403 (Tex.Civ.App.1954).
Three observations are pertinent here: 1) The above referenced authorities are of pre-Mini-Code origins in which the courts, for insurer liability purposes, were unwilling to recognize the creditor as a shield between the insured and the insurer; 2) the *819 broker status of retailers who sell insurance is now statutorily mandated in contests between the insurer and the insured (see § 27-8-5(c)); and 3) it is not the status of Colonial Bank (which is the ultimate creditor, but which is neither agent nor broker), but the status of Jim Burke, as broker or agent, that is the subject of our inquiry.
The United States Supreme Court, in a case challenging the validity of a Virginia regulatory statute, pointed out:
"The `production' of insurance'production' being insurance jargon for obtaining businessis in the main, carried on by two groups, agents and brokers. Though both are paid by commission, the different ways in which the two groups perform their functions have important practical consequences in the conduct of the insurance business, and hence in its regulation. The agent is tied to his company. But his ability to `produce' business depends upon the confidence of the community in him. He must therefor cultivate the good will and sense of dependence of his clients.... The broker, on the other hand, is an independent middleman, not tied to a particular company. He meets more specially the needs of large customers, using their concentrated bargaining power to obtain the most favorable terms from competing companies." Osborn v. Ozlin, 310 U.S. 53, 60-61, 60 S.Ct. 758, 761, 84 L.Ed.2d 1074 (1940).
This description of "broker" aptly describes an entity in Jim Burke's unique position. Clearly, the bargaining power of potentially thousands of customers each year puts Jim Burke in a situation where it can obtain the "most favorable terms from competing [insurance] companies." While brokers generally seek to obtain the most favorable terms for their clients, the creditor broker uses the competition between insurance companies to obtain the highest compensation for itself. This "reverse competition" results in a high premium rate for the consumer because he has no voice in determining rates, but obtains insurance only as an incident to the purchase of retail merchandise.
In Browder v. Hanley Dawson Cadillac Co., 62 Ill.App.3d 623, 20 Ill.Dec. 138, 142, 379 N.E.2d 1206, 1210 (1978), the court stated:
"An insurance broker is distinguished from an insurance agent in that he is not permanently employed by any principal, but holds himself out to employment by the public."
While Jim Burke's holding "out to employment by the public" is directly linked to its retail sales of automobiles, and not to sales of insurance coverage, the indirectness and subtlety of its insurance operation does not obscure the true nature and character of the relationship between Jim Burke and its customer with respect to its offer of credit insurance incident to its retail sales transactions. Although the sale of credit life and credit disability insurance, which the seller cannot require the purchaser to buy (§ 5-19-20), is merely incidental to Jim Burke's automobile sales, the dealership's insurance operation earned profits of $167,874.88 in 1982 and $231,354.86 in 1983.[4] Thus, Jim Burke, which "is not permanently employed by any principal" (see Browder, supra), and is not tied to any one insurer, but has the freedom to "shop around," cannot be classified, as a matter of law, as an insurance agent in the classical sense of that term.
It is the agent's or broker's duty, in all transactions concerning or affecting the subject of the agency, to exercise reasonable skill, care, and diligence with regard to the principal's interest with utmost good faith and loyalty. Highlands Underwriters Ins. Co. v. Eleganté Inns, Inc., 361 So.2d 1060, 1065 (Ala.1978); Crumpton v. Pilgrim Health & Life Insurance Co., 35 Ala.App. 363, 46 So.2d 848 (1950). Not *820 only is there case law support for the proposition that an insurance broker is by definition an agent of the insured, (Highlands Underwriters, supra, at 1065), but § 27-8-4(c) mandates this relationship in certain situations. Specifically, § 27-8-4(c) provides that in any controversy between the insured or his beneficiary and the insurer issuing the policy, the broker who solicits the application for the insured shall be regarded as representing the insured.
Moreover, a strong case may be made for the proposition that it is only by the court's recognizing Jim Burke's status as an insurance broker, rather than as an agent, that the public-protection spirit of both the Mini-Code and the Insurance Code can be effectuated. Under general rules of agency, the law's recognition of the broker status of such retail establishments fixes the duty owed by Jim Burke, as agent, to the plaintiffs/consumers, as principals. And Jim Burke cannot, by self-serving acts, such as choosing to deal with only one insurer, put itself in the classification of an "insurance agent," as opposed to an "insurance broker," and thereby avoid its fiduciary duty to the insured.
On the other hand, a viable alternative approach is supported by the proposition that, ordinarily, the broker/agent status of one who sells insurance is a question of fact (American Pioneer Life Ins. Co. v. Sandlin, 470 So.2d 657, 665 (Ala.1985)). Under these undisputed facts, whether a retail establishment (e.g., Jim Burke) that provides credit life and credit disability insurance as an incident to the sale of merchandise, is a broker as a matter of law, or whether its broker/agent status is a question of fact should await resolution by the court in an adversary context.
If the broker status of the retailer has been established, whether as a matter of law or as a matter of fact, it necessarily follows that the insured is the principal in the classical principal/agent sense, and that the broker's duty is governed by the general law of agency. It is the implied duty of the agent, in all transactions affecting the subject of the agency, to give his principal his best judgment and recommendations. Highlands Underwriters, supra, at 1064. Advice as to the price of the insurance and the availability of less expensive comparable insurance certainly would be included in the agent's duty to give the principal his best judgment and recommendations. Further, if the factfinder, under appropriate instructions, should determine that the retailer has breached its duty as broker, then it should determine the damages, if any, proximately resulting therefrom to the insured, as the retailer's principal.
NOTES
[1] The plaintiffs sought to include in the class "all the persons who have purchased credit life insurance from defendants or disability insurance from the Defendant and whose applicable statute of limitations to bring said action has not expired." Class certification, however, was sought only as to the plaintiffs' claims based on wrongful receipt of commissions.
[2] The claims for improper credit of refunds and for conversion are totally unsupported by the evidence of record and do not merit further discussion.
[3] All life insurance procured by Jim Burke on behalf of its customers was placed with one company. Volunteer State Life Insurance Company, while two companies, MIC and Autry Insurance Agency, handled the property insurance of Jim Burke's customers.
[1] In support of their claim of alleged Mini-Code violations, the plaintiffs contend that Jim Burke is not a licensed insurance agent or broker. Neither in their pleadings, nor in their briefs, however, do they treat Jim Burke's alleged violations of the licensure provisions of the Insurance Code (§ 27-8-1, et seq.) as a separate claim.
[2] Because the evidence conclusively excludes Colonial as a possible insurance broker or agent in the instant transaction, summary judgment in any event would be appropriate as to Colonial.
[3] For the sake of clarity, it should be noted that "insurance agent" and "insurance broker" are technical terms used to describe the two classifications of persons who sell, procure, produce, or otherwise obtain insurance business, and are not to be confused with the term "agent" as used in the classical principal/agent context. For example, an insurance broker is an agent within the contemplation of the law of agencythe query being, "Who is the agent's principal?"
[4] All of the salespeople involved in the sale receive a small percentage of the commission (as an incentive to sell the customer credit life and disability insurance), with the major portion going to the dealership. While the evidence shows that from 1982 through May 1984, Jim Burke employed two licensed agents, it is the salespersons who actually "sell" the insurance to the customersnot necessarily the licensed agents.