630 So.2d 368 (1993)
Glenda JACKSON, et al.
v.
The CIT GROUP/SALES FINANCING, INC.
1911928.
Supreme Court of Alabama.
September 10, 1993.
Rehearing Denied December 10, 1993.
*369 William C. Elliott of Parnell, Crum & Anderson, P.A., Montgomery, for appellant.
Alan W. Heldman and David W. Proctor of Johnston, Barton, Proctor, Swedlaw & Naff, Birmingham, for appellee.
PER CURIAM.
The plaintiffs, James S. Jackson, Glenda Jackson, David R. Winslett, and Vickki G. Winslett, appeal from a summary judgment in favor of the defendant, CIT Group/Sales Financing, Inc. ("CIT"). The plaintiffs also appeal from the trial court's dismissal of their claims against various fictitiously named defendants.
The plaintiffs brought this action against CIT and sundry fictitiously named parties, alleging fraud, breach of contract, and violations of the "Mini-Code," § 5-19-1 et seq., Ala.Code 1975, and the Deceptive Trade Practices Act, § 8-19-1 et seq., Ala.Code 1975, in connection with the financing of David and Vickki Winslett's purchase of a mobile home. The issues are: (1) whether the plaintiffs presented substantial evidence of fraud, (2) whether the financing contract is null and void on the basis that it violates the Mini-Code, (3) whether the plaintiffs presented substantial evidence in support of their claim under the Deceptive Trade Practices Act, and (4) whether the trial court erred in dismissing the claims against the fictitiously named parties.[1]
A summary judgment under Rule 56, Ala. R.Civ.P., is proper when the trial court determines that there is no genuine issue of material fact and that the movant is entitled to a judgment as a matter of law. Rule 56(c), Ala.R.Civ.P.; Lee v. Clark & Assocs. Real Estate, Inc., 512 So.2d 42, 44 (Ala.1987); George v. Federal Land Bank of Jackson, 501 So.2d 432, 424 (Ala.1986). When the movant makes a prima facie showing that no genuine issue of material fact exists, the nonmovant then has the burden to introduce substantial evidence creating such an issue. Rule 56; § 12-21-12, Ala.Code 1975; Bean v. Craig, 557 So.2d 1249, 1252 (Ala.1990). Like the trial court, this Court reviews the evidence and resolves all reasonable doubts in favor of the nonmovant. Specialty Container Mfg., Inc. v. Rusken Packaging, Inc., 572 So.2d 403, 404 (Ala.1990).
Viewed most favorably to the nonmovant plaintiffs, the evidence is as follows:
On September 27, 1984, David Winslett and Vickki Jackson purchased a new 1985 *370 Champion mobile home from Metro Homes. David and Vickki were 18 years old and were about to be married. In order for David and Vickki to obtain financing, her parents, James and Glenda Jackson, in addition to David and Vickki, signed the "security agreement" ("the contract"), setting forth the terms of the credit purchase.
James Jackson, David Winslett, and Vickki Jackson signed the contract in an office of Metro Homes, located in Gardendale, Alabama.[2] None of them read the contract before signing it.[3] In her deposition, Vickki testified that before signing, she asked the Metro Homes representative, a woman who has not been identified, whether the contract was assumable and whether it contained any penalties for prepayment:
"I specifically asked, if we get ready to sell the trailerbecause we made it perfectly known that we only wanted the trailer for a couple of yearswhen we get ready to sell this trailer, is this note assumable? We was assured that this note was assumable. I asked them, `Is there a prepayment penalty?' They said `No. You may pay this off at any time with no penalties.'" Vickki also stated that the Metro Homes representative assured them that a portion of each monthly payment would pay interest while another would pay principal. Furthermore, Vickki Winslett testified that it was their understanding that if they arranged for a third party to assume the note, they would no longer be liable under the contract.
When James Jackson, David, and Vickki signed the contract, no CIT representatives were present. The contract, however, consisted of a form agreement prepared by CIT, which displayed its name in the upper left corner of the first page. Under its terms, the plaintiffs made a down payment of $1,680 and financed $15,370, the balance of the purchase price. Under the financing agreement, David and Vickki were to make 180 payments of $231, beginning November 1, 1984. The annual percentage rate was 16.5%; the total cost of the credit purchase, including the down payment, was $43,317.
With regard to assumability, the contract provided in pertinent part:
"ASSUMPTIONSomeone buying my commodity may, subject to conditions, be allowed to assume the remainder of the contract on the original terms."
As to prepayment, the contract provided in part:
"Rebate for PrepaymentAny time, I [the debtor or guarantor] have the right to pay this contract in full or to pay more than my schedule requires. Except in the case of prepayment in full by refinancing within 90 days of the date of this Agreement, if I pay in full ahead of schedule, you [holder of the contract] will refund the unearned Finance Charge based on the Rule of 78's."
We note that the procedure referred to in the contract as the "Rule of 78's" is referred to in § 5-19-4(c)(1)b., Ala.Code 1975, as "the rule of 78ths or sum of the digits method." It is defined in Black's Law Dictionary (6th ed. 1990) under the entry "Rule of 78."
After the plaintiffs signed the contract, Metro Homes assigned it to CIT, in accordance with an assignability provision included in the form contract. David and Vickki first became aware of CIT when they received their first monthly notice of payment due in October 1984. The Winsletts thereafter made timely, monthly payments under the contract.
Later, when the Winsletts became interested in buying a house, they began to look for ways either to sell the mobile home or to have a third party assume the contract. In March 1989, Randy and Kim Higgins, a young, married couple, submitted an application to transfer or assume the contract. CIT denied their application. The Higginses subsequently submitted a second application with two cosigners. Again CIT denied the application. When Vickki inquired why the *371 Higginses' application had been rejected, a CIT representative told her that CIT could not tell her because such information was confidential. According to Vickki's deposition testimony, a CIT customer service representative told her over the telephone that because CIT no longer made mobile home loans, it rarely allowed existing mobile home loans to be assumed by anyone. Vickki also learned for the first time that even if CIT accepted an applicant, the Winsletts would remain liable on the contract.
Discouraged in their attempts to have the note assumed, the Winsletts then tried to sell the mobile home and pay the indebtedness with the proceeds. After receiving an offer from Laura Roberts to buy the mobile home for $11,500, the Winsletts made an offer to CIT to pay the loan for this amount. CIT did not respond. At the time of this offer, the amount necessary to pay the note in full under the Rule of 78ths was more than $16,000.
The plaintiffs brought this action on December 13, 1990, seeking to have the contract held unenforceable and to obtain damages. After more than a year of pretrial discovery, CIT moved for a summary judgment. The trial court entered a summary judgment in favor of CIT on all the claims against it. In addition, the trial court also denied the plaintiffs' motion to certify a class action based on the alleged Mini-Code violation and dismissed all claims against the fictitiously named defendants.

Fraud
The first issue is whether the plaintiffs presented substantial evidence of fraud.
Although CIT argues that, as a credit corporation, it cannot be liable for the misrepresentations of Metro Homes, an independent retail seller, we note that a provision of the contract subjects CIT to all claims and defenses that the debtor could assert against Metro Homes:
"Notice:
"Any holder of this consumer credit contract is subject to all claims and defenses which the debtor could assert against the seller of goods or services obtained pursuant hereto or with the proceeds hereof. Recovery hereunder by the debtor shall not exceed amounts paid by the debtor hereunder."[4]
Therefore, under this provision of the contract, CIT was liable for any claim or defense that the plaintiffs could assert against Metro Homes.
The plaintiffs' complaint specifies three alleged misrepresentations:
"a. That the Plaintiffs would be able to sell the property purchased and provide a purchaser to the Defendants who would be allowed to assume the contract for purchase.
"b. The payment schedules required of the Plaintiffs to be paid to the Defendants under the contract [sic].
"c. That the Plaintiffs would be able to make monthly payments towards the principal amount of the debt."
With regard to the first allegation, the record reveals no substantial evidence that the Metro Homes representative misrepresented any term concerning the assumability of the contract. The provision dealing with assumption of the contract provides that a person buying the commodity from the debtor may assume the remainder of the contract on its original terms; however, such assumption of the contract is "subject to conditions." According to Vickki's deposition testimony, the Metro Homes representative told her that the contract could be assumed. The plaintiffs argue that because the representative did not also inform them that the right to have a third party assume the contract was subject to conditions, i.e., approval by the creditor, the representative misrepresented the term of the contract. We think such an inference is unwarranted from the evidence presented. The Metro Homes representative did not make a false statement that the note was assumable simply by not *372 explaining that assumption would be subject to conditions. Furthermore, any representation that a subsequent purchaser "would be allowed to assume" the note would have constituted a promise to perform an act in the future, and there is no evidence of an intent at the time of the representation not to allow assumption. "To be fraudulent, a promise to perform in the future must be made with a present intent not to perform." B.K.W. Enterprises, Inc. v. Tractor & Equip. Co., 603 So.2d 989, 993 (Ala.1992).
With regard to the second alleged misrepresentation, our review of the record reveals no evidence that the Metro Homes representative made any representation, false or otherwise, about the schedule of the payments to be made under the contract.
With regard to the third allegation of fraud, we find no substantial evidence that the Metro Homes representative misrepresented any term of the contract when she allegedly told the plaintiffs that they would be able to make monthly payments toward payment of the principal due on the note. The contract signed by the plaintiffs provides for "predetermined interest." Under this method of calculating interest, the total amount of interest accruing over the term of the note is computed in advance and added to the amount financed, i.e., the principal, to reach a gross balance. Each monthly payment, therefore, simply reduces the gross balance due; no part of the payment is applied separately to interest or principal. By contrast, what Don Smith, a CIT executive vice president, referred to as "simple interest" is a method of computing interest based on a stated rate and on the number of days between payments; the amount of each monthly payment received is applied first to interest earned during the period since the last payment and then to principal. Under a "simple interest" contract, therefore, it is possible to produce an amortization schedule; however, according to the undisputed testimony of Don Smith, no such schedule is possible under a "predetermined interest" note.
The plaintiffs argue that because the contract was a "predetermined interest" note, the Metro Homes representative misrepresented its terms when she stated that David and Vickki Winslett would be able to make monthly payments toward the principal amount of the debt. This argument seems founded on an erroneous factual premise, i.e., that the Winsletts have never made any payments toward principal. Although, according to the evidence, it is apparently not possible to produce an amortization schedule for a "predetermined interest" note, the method of calculating a finance charge refund in the event the debtor pays the debt in full, ahead of the schedule, reveals that the Winsletts' monthly payments paid the principal amount of the obligation as well as the interest accrued on it. If the Winsletts had paid the note in full before the termination of the 15-year term, they would have received a credit for unearned finance charge as calculated by the Rule of 78ths method. When the parties entered into this contract, the Rule of 78ths method for calculating finance charge refunds was authorized. § 5-19-4(c), Ala.Code 1975, amended by 1988 Alabama Acts, Act No. 88-87. Thus, undisputed evidence in the record shows that each monthly payment, in effect, went toward an obligation that included both principal as well as interest.
In their brief, the plaintiffs also assert that the note was misrepresented as a "simple interest" financing contract. However, the plaintiffs' complaint fails to state any such allegation of fraud, and the record does not show that the Metro Homes representative made any such representation to the plaintiffs. Moreover, the plaintiffs have not shown what legal injury they suffered by entering into a "predetermined interest" contract as opposed to a "simple interest" contract. There is also no claim that the rate of interest charged under the contract is illegal.

Violation of the Mini-Code
The second issue is whether the contract is null and void as violating § 5-19-6 of the Mini-Code.
Because the Mini-Code is a regulatory statute designed to protect the public, contracts made in derogation of its provisions *373 are null, void, and therefore unenforceable. Derico v. Duncan, 410 So.2d 27 (Ala.1982).
Section 5-19-6 provides:
"Any creditor, when extending credit with respect to a consumer credit sale, loan or lease other than open-end credit, shall at that time furnish to the debtor duplicate copies of all instruments executed by the debtor in connection with the transaction. The credit sale contract, loan note or lease shall contain the following statement in eight point type immediately above the space for the borrower's signature.

"CAUTIONIT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT."
(Emphasis added.)
The cautionary language of the contract prepared by CIT stated:
"CAUTIONIT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT. NOTICE: SEE OTHER SIDE FOR IMPORTANT INFORMATION."
The plaintiffs argue that because the CIT contract places additional language between the required cautionary language and the signature line, it violates § 5-19-6 and is therefore null and void. We disagree.
The seven words added to the statutorily required warning, which direct the borrower's attention to important information on the reverse side of the one-page contract, do not violate § 5-19-6. The purpose for requiring the particular words provided in the statute and for prescribing their placement "immediately" above the space for the borrower's signature is to ensure that the borrower see them, read them, and follow their instruction by preventing the creditor from obscuring or "burying" the warning in the language of the contract. The additional language here includes only seven words, whose presence does not materially reduce the prominence of the cautionary language. Furthermore, because the additional language directs the borrower's attention to terms on the reverse side of the contract, it serves, rather than defeats, the purpose of the statute.

Deceptive Trade Practices Act
The third issue raised by the plaintiffs is whether the summary judgment was proper on their claim under the Alabama Deceptive Trade Practices Act, § 8-19-1 et seq., Ala. Code 1975.
Section 8-19-5 declares unlawful 21 specifically described acts or practices in the conduct of trade or commerce. Section 8-19-5 also includes a general provision making it unlawful to "[engage] in any other unconscionable, false, misleading or deceptive act or practice in the conduct of trade or commerce." Id. at 8-19-5(23).
The plaintiffs base their claim under the Deceptive Trade Practices Act on the same factual allegations and arguments made in support of their claim of fraud. However, as noted above, the plaintiffs presented no substantial evidence that Metro Homes misrepresented any terms of the contract. Because the plaintiffs presented no substantial evidence to support their allegations of misrepresentation or any other conduct actionable under the Deceptive Trade Practices Act, we hold that the summary judgment on their claim under the Act was proper.

Claims Against Fictitiously Named Parties
The fourth issue is whether the trial court erred in dismissing the plaintiffs' claims against various fictitiously named parties.
Dismissal of all claims against all the fictitiously named parties was proper. Although their action had been pending for a year and a half before the trial court entered the summary judgment, the plaintiffs had neither identified nor added as defendants any of the parties fictitiously named in their complaint. In its judgment, the trial court concluded that the only parties not before the court, who had any connection with the transaction, were either already known or could be identified easily, e.g., Metro Homes personnel. After carefully reviewing the record, we agree with the trial court and hold that it did not abuse its discretion in dismissing these claims.
Based on the foregoing, we hold that the summary judgment on all the claims against CIT and the dismissal of the claims against *374 the fictitiously named parties were proper. Therefore, we affirm.
AFFIRMED.
MADDOX, ALMON, ADAMS, HOUSTON and STEAGALL, JJ., concur.
HORNSBY, C.J., and SHORES and INGRAM, JJ., concur specially.
HORNSBY, Chief Justice (concurring specially):
The financing scheme employed by the defendants in this case is a "predetermined interest" contract with interest to be refunded according to the "rule of 78ths" upon prepayment. The plaintiffs executed this 15-year contract on December 27, 1984. The amount financed under this contractthe principalwas $15,370.04. After five and one-half years of timely monthly payments, the plaintiffs sought to pay off the contract pursuant to the "no penalty" prepayment terms of the contract. The amount necessary to pay off the contract as of June 27, 1990, was $15,884.58. That is, even though the plaintiffs had already paid defendants $16,458.72 under the contract, the amount required to pay off the debt was still $514.54 more than the original principal amount.
After a close examination of the record, I must agree with the majority that, in this case, the representations concerning the financing scheme were not technically fraudulent at the time the contract was signed. However, the operation of this financing scheme is so oppressive that I have real concern whether such contracts are unconscionable or violate public policy. If such contracts were still legal in our State, I believe that they would be subject to challenge on such grounds. I commend the Legislature for its amendment to the "Mini-Code," see Ala.Code 1975, § 5-19-4(c) (amended 1988), so that the financing scheme used by the defendants in this case can no longer legally apply to extensions of consumer credit for terms longer than 61 months.
SHORES and INGRAM, JJ., concur.
NOTES
[1] In their brief to this Court, the plaintiffs raise several other issues. However, because these other issues do not relate to claims and allegations made in their complaint, we do not address them.

We note also that the plaintiffs neither make any argument nor cite any authority in support of their breach of contract claim. Therefore, they have waived any issue as to that claim.
[2] When Metro Homes delivered the mobile home, a Metro Homes representative required Glenda Jackson to sign the contract as a condition of delivery.
[3] In her deposition, Glenda Jackson also stated that she did not read the contract before signing it.
[4] A regulation promulgated by the Federal Trade Commission makes it an "unfair or deceptive act or practice," within the meaning of § 5 of the Federal Trade Commission Act, to take or receive a consumer credit contract without including this language. Preservation of Consumer's Claims and Defenses, 16 C.F.R. § 433.2 (1991).