686 So.2d 1171 (1996)
UNITED COMPANIES LENDING CORPORATION
v.
Michael McGEHEE, et al.
1941234.
Supreme Court of Alabama.
October 11, 1996.
Rehearing Denied December 6, 1996.
*1172 M. Christian King of Lightfoot, Franklin & White, L.L.C., Birmingham, John N. Leach, Jr. of Helmsing, Lyons, Sims & Leach, P.C., Mobile, for Appellant.
Royce A. Ray III and George W. Finkbohner III of Finkbohner & Lawler, L.L.C., Mobile, for Appellees.
Robert E. Sasser, Dorothy W. Littleton and Michael B. O'Connor of Sasser & Littleton, P.C., Montgomery, for Amicus Curiae Mortgage Bankers Association of Alabama, Inc.
Bruce J. Downey III of Capell, Howard, Knabe & Cobbs, Montgomery, for Amicus Curiae Southern Community Bankers.
Palmer C. Hamilton, George A. LeMaistre, Jr. and A. Carson I. Nicolson of Miller, Hamilton, Snider & Odom, L.L.C., Mobile, for Amicus Curiae Federal National Mortgage Association.
H. Hampton Boles and Michael L. Edwards of Balch & Bingham, Birmingham, for Amicus Curiae Alabama Bankers Association.
Scott Corscadden, Deputy Atty. Gen., for Amicus Curiae Alabama State Banking Department.
Leah O. Taylor of Taylor & Taylor, Birmingham, for Amicus Curiae Alabama Trial Lawyers Association, in support of Appellees.

On Application for Rehearing
PER CURIAM.
The opinion of March 22, 1996, is withdrawn, and the following opinion is substituted.
Pursuant to Rule 5, Ala. R.App. P., this Court granted defendant United Companies Lending Corporation ("UCLC") permission to appeal from an interlocutory order denying its motion for a summary judgment and entering a partial summary judgment for the plaintiffs, Michael and Joyce McGehee. By entering the partial summary judgment, the circuit court disallowed UCLC'S defense by which it seeks to establish that § 5-19-31(a), Ala.Code 1975, exempts it from the consumer protection provisions known as the Mini-Code, § 5-19-1 to -31, Ala.Code 1975in particular, the 5% limit on discount points imposed by § 5-19-4(g). The issue, as narrowed on rehearing, is whether a mortgagee that is not approved to make National Housing Act loans in Alabama comes within the provision of § 5-19-31(a) that "The provisions of this chapter ... shall not apply to any loan ... involving an interest in real property ... where the creditor is a lending institution which is an approved mortgagee under the provisions of the National Housing Act."[1]
In June 1991, UCLC made a loan to the McGehees and took a mortgage on their home as security. The McGehees borrowed $31,827.76; in determining the amount the McGehees were to repay, UCLC added to that amount $2,972.24 in prepaid finance charges. Of the prepaid finance charges, $2,779.24 was imposed as a "loan fee," which is a nonrefundable mortgage origination fee within the meaning of "points" as that term is used in § 5-19-4(g), see Smith v. First Family Financial Services, Inc., 626 So.2d *1173 1266 (Ala.1993). This amount of points is approximately 8% of the amount financed.[2]
Section 5-19-4(g) provides:
"Notwithstanding the provisions of this or any other section of this chapter, a creditor may, pursuant to contract, in a consumer loan or consumer credit sale secured by an interest in real property, charge and collect points in an amount not to exceed five percent of the original principal balance in the case of a closed-end loan or credit sale, or five percent of the total line of credit in the case of an open-end credit plan. Points may be paid in cash at the time of the loan or credit sale, or may be deducted from the proceeds and included in the original principal balance. Points shall be in addition to all other charges and are fully earned on the date of the loan or credit sale and may be excluded from the finance charge for the purpose of computing the finance charge refund."
(Emphasis added.)
Section 5-19-31(a) provides:
"The provisions of this chapter, except the provisions of subdivision (1) of Section 5-19-1 and Section 5-19-3, shall not apply to any loan, forbearance, credit sale, lease, or other transaction involving an interest in real property or the sale, lease, or mortgage of an interest in real property, where the creditor is a lending institution which is an approved mortgagee under the provisions of the National Housing Act or is exempt from licensing under this chapter, or to any other loan, forbearance, credit sale, lease, or other transaction that is not a consumer transaction or to any transaction by a trust institution as defined in Section 5-12A-1(1), in its capacity as a fiduciary under any plan or agreement qualified under 26 USC 401(a) or defined by 5 USC 8437, 26 USC 403(b) or 26 USC 457 or a trust exempt under 26 USC 501."
(Emphasis added.)[3]
The McGehees filed an action against UCLC alleging, in pertinent part:
"54. On or around June 21, 1991, the Defendants falsely represented to Plaintiffs that Defendant United Companies Lending Corporation is an approved mortgagee under the National Housing Act and further that Defendant UCLC is not governed by the provisions of Alabama's consumer protection law, Alabama Code § 5-19-1 et seq., commonly known as the `Mini-Code.' Said representations were false, and at the time of the McGehee loan transaction Defendants knew that they were false and made them with the purpose of deceiving Plaintiffs and inducing Plaintiffs into entering into an unlawful loan transaction. The McGehee transaction was not made pursuant to the National Housing Act and was and is not a National Housing Act loan. On June 21, 1991, the date of the McGehee loan transaction made the basis of this lawsuit, Defendant United Companies Lending Corporation was not an approved mortgagee under the terms of the National Housing Act, and Defendants knew that Defendant UCLC's branch office at 857-A Downtowner Boulevard, Mobile, Alabama 36609, was not an approved branch under the National Housing Act. Many months prior to June 21, 1991, the date of the loan transaction made the basis of this lawsuit, Defendants ceased making any National Housing Act loans, and were not making any National Housing Act loans in Alabama or elsewhere at any time material to the instant action. Defendants never applied for nor received National Housing Act Mortgagee approval status for Defendant UCLC's branch office located at 857-A Downtowner Boulevard, Mobile, Alabama, 36609.

*1174 "55. Defendants also falsely represented to Plaintiffs in the McGehee transaction that Defendant UCLC could lawfully charge points in excess of 5% of the original principal balance of the McGehee loan. Defendants further falsely represented to Plaintiffs during the loan closing on June 21, 1991 that everything regarding the McGehee transaction would be `okay.' Said representations of material facts regarding the McGehee loan transaction were false and Defendants knew that they were false at the time of the McGehee transaction, and Plaintiffs justifiably relied upon said misrepresentations in entering into the loan made the basis of this lawsuit.
"56. Defendants intentionally concealed material facts from Plaintiffs about the McGehee loan transaction which Defendants had a duty to disclose to Plaintiffs. Specifically, Defendants failed to tell Plaintiffs that Defendant UCLC was in fact not an approved mortgagee under the National Housing Act, that Plaintiffs were and are in fact entitled to the protection of Alabama's consumer protection law known as the `Mini-Code', and further that Defendant UCLC had no right to charge and/or collect `points' from Plaintiffs in an amount in excess of 5% of the original principal balance of the McGehee loan.
"57. The aforesaid actions by Defendants constitute conscious and deliberate oppression, fraud, wantonness, and/or malice perpetrated upon the Plaintiffs. Neither of the Plaintiffs knew or through reasonable diligence could have known of the fraudulent, unlawful and wrongful conduct and activities perpetrated upon them described herein until Plaintiffs were informed of said wrongful conduct of Defendants herein on or around the latter part of August or the first part of September, 1993 by the undersigned counsel for the Plaintiffs. Plaintiffs are uneducated, unsophisticated, do not have high school diplomas, and did not realize until late August or September of 1993 that the loan made the basis of the McGehee transaction violated Alabama Code § 5-19-4(g). Defendants misled Plaintiffs and concealed the fraud and other wrongful conduct perpetrated upon Plaintiffs described herein by forcing Plaintiffs to sign the piece of paper attached hereto as Exhibit D entitled `Acknowledgement by Applicant for Real Estate Loan.' Defendants falsely represented to Plaintiffs in Exhibit D that Defendant UCLC is not governed by Alabama Code § 5-19-4(g) to keep Plaintiffs from discovering the fraud and other wrongs perpetrated upon them."
UCLC raised as a defense and as a ground for summary judgment the exemption stated in § 5-19-31(a). The McGehees responded with a motion for summary judgment in their favor as to UCLC's exemption defense. The circuit court denied UCLC's motion and granted the McGehees' motion. This Court allowed an appeal pursuant to Rule 5, Ala. R.App. P.
The Department of Housing and Urban Development ("HUD") has promulgated regulations to effectuate the provisions of the National Housing Act ("NHA"). See 24 C.F.R. Part 202 (1994); Part 202 consists of §§ 202.1 through 202.20. Section 202.11(a) reads, in pertinent part:
"(a) Approval. (1) A mortgagee may be approved for participation in the mortgage insurance programs authorized by the National Housing Act ... upon filing a request for approval on a form prescribed by the Secretary and signed by the applicant.... Approval of the application by the Secretary shall constitute:
"(i) The Secretary's agreement that the mortgagee shall be considered an approved mortgagee except as otherwise ordered by the Mortgagee Review Board, or an officer or subdivision of the Department of Housing and Urban Development to which the Mortgagee Review Board has delegated its power, unless the mortgagee voluntarily relinquishes its approval;
"(ii) The mortgagee's agreement to comply at all times with the General approval requirements of § 202.12, and the special requirements for the class of mortgagee, at §§ 202.13, 202.14, 202.15, 202.16, or 202.17, for which it was approved; and
"(iii) An origination approval agreement under which approval to originate mortgages for insurance may be terminated as *1175 provided in paragraph (d) of this section....
". . . .
"(4) Approval of mortgagees may be restricted to geographic areas designated by the Secretary or may be approved to operate on a nationwide basis."
(Emphasis added.)[4]
UCLC was approved on October 3, 1990, as a "nonsupervised mortgagee" (§ 202.14) for 1-4 family residences. The approval by HUD includes this restriction: "This approval covers the HUD Field Office Jurisdiction of New Orleans, Louisiana."
Under the HUD regulations, a mortgagee approved for a limited geographic area may originate NHA-insured mortgage loans from outside its approved area only by establishing branch offices that are themselves approved to submit applications for NHA insurance from the region in which the branch office is located:
"(m) Branch offices. [An approved mortgagee] may, only upon approval by the Secretary, maintain branch offices for the submission of applications for mortgage insurance. The mortgagee shall remain fully responsible to the Secretary for the actions of its branch offices."
24 C.F.R. § 202.12(m).[5]
The Mortgagee Approval Handbook published by HUD[6] reiterates these requirements for approval of branch offices in each jurisdiction in which the mortgagee wishes to originate NHA- or HUD-insured loans. Chapter 2 gives the "Mortgagee Approval Requirements," and division 2-1 gives the "General Approval Requirements," including paragraph h, which reads in pertinent part as follows:
"Extraterritorial Authority: [An approved mortgagee may] Participate in geographic areas that are approved by HUD.
"(1) Main offices may participate in the jurisdiction of the local HUD Field Office where they are located.
"(2) Branch offices may participate in the jurisdiction of the local HUD Field Office where they are located.
"(3) Mortgagees wishing to do business in HUD Field Office jurisdictions other than the HUD Field Office jurisdiction where the approved main office or branch offices are located must request such permission by completing form HUD-92001K, Notification of Mortgagee Change.
"(a) This permission to do business is limited to HUD Field Office jurisdictions in states contiguous to the state in which the approved main or branch offices are located; and in the case of servicing, only to the extent that they are within 200 miles of the mortgaged property to be serviced or they provide toll-free or accept collect calls on servicing questions."
(Emphasis added.)
UCLC acknowledges that it has no approved Alabama branch office. There is no evidence that UCLC had sought permission under the Handbook's provision 2-1(h)(3)(a) to do NHA-related business outside Louisiana, and, even if it had, Alabama is not contiguous to Louisiana.
The only legislative purpose for exemption from the Mini-Code of mortgage loans by NHA-approved mortgagees that presents itself *1176 to us is the fact that HUD extensively regulates its approved mortgagees. However, the Mortgagee Approval Handbook lists extensive requirements for approved main and branch offices: yearly verification reports; experience and qualifications of employees, including branch office managers; staffing and facilities requirements; communications capability and responsibility; restrictions on escrow accounts; responsibility for originating and servicing mortgages in accordance with HUD requirements; and net worth requirements. Because UCLC's Mobile office is not an approved branch office, however, these requirements do not apply to that office, and they do not apply to any other offices it has in Alabama.
The McGehees' mortgage loan from UCLC is not an NHA-insured mortgage loan. Thus, the provisions of the NHA do not apply to their loan.
UCLC argues that its mortgagors in Alabama, including the McGehees, are protected by Federal laws, notably the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2601 et seq., and the Truth-In-Lending Act, 15 U.S.C. § 1601 et seq., so that the McGehees, UCLC says, are not left unprotected if UCLC is exempt from the Mini-Code. However, those Federal acts apply more broadly than to NHA-approved mortgagees, so the application of those acts is not a basis for exempting NHA-approved mortgagees from the protections given by the Mini-Code. Moreover, those Federal acts simply require disclosure and a three-day right of rescission; they do not set any limits on finance charges in general or points in particular.
For a discussion of the inadequacy of these disclosure and rescission requirements in protecting disadvantaged borrowers from predatory lending practices, including high discount points, see the testimony developed at a February 4, 1993, hearing before the House Subcommittee on Consumer Credit and Insurance. "Adding Injury to Injury: Credit on the Fringe." Hearing before the Subcommittee on Consumer Credit and Insurance of the Committee on Banking, Finance, and Urban Affairs, House of Representatives, Feb. 4, 1993, Serial No. 103-3. Witnesses and several members of the subcommittee expressed opinions that disclosure and rights of rescission do not provide enough protection, because many mortgages other than purchase-money mortgages do not require disclosure of annual percentage rates; because victims of targeted predatory practices are often working people who are less educated and less sophisticated about reading such instruments; and because the lenders start with small percentages of a homeowner's equity and later renew the loan, capitalizing accrued interest and thereby increasing the balance and the payment beyond the mortgagor's ability to pay.
The description of predatory practices was summarized by Steven D. Caley of the Atlanta Legal Aid Society, Inc., whose prepared testimony includes the following:
"Four principal conditions have combined to encourage unscrupulous lenders to defraud or mislead homeowners, particularly elderly, low income and unsophisticated homeowners who typically reside in redlined areas of their communities. The numerous schemes and devices utilized by these companies have been developed with the specific intent of ensnaring unsuspecting homeowners into signing loan papers with egregiously high interest rates, discount points, and other charges that the homeowners can never hope to repay so that the lenders can ultimately obtain the equity in the home through foreclosure proceedings. The four principal conditions follow.
"First, the homes have high equity. Homeowners have acquired high equity in their homes either through appreciation, which has occurred at an extraordinarily high rate in the last 10 years (particularly in the sunbelt area), or by simply paying most or all of the mortgage on the home.
"Second, many states deregulated usury limits on mortgages in the early 1980s in response to skyrocketing interest rates of the late 1970s. Many states have no interest limits at all and many who do, have extremely high limits such as Georgia which has a five percent per month or sixty percent limit per year. Additionally many states do not regulate mortgage *1177 lenders, mortgage brokers or home improvement companies who are often part of the schemes which will be described below.
"Third, banks have redlined significant portions of their communities. When consumers no longer have access to conventional lenders for loans at reasonable rates of interest, they have no one else to turn to but the high rate lenders.
"Fourth, in some states such as Georgia, foreclosures are not supervised in any manner whatsoever. Georgia has no requirement that courts oversee foreclosures before, during, or after the sale in order to protect the homeowners' interest.
"In sum, homeowners with high equity values in their homes are the target of unscrupulous lenders who can charge any rate of interest they want to charge to homeowners who do not have access to credit from conventional lenders. These unprincipled lenders have basically placed themselves in a win-win situation. If the homeowner pays the outrageous amounts, the lender reaps an enormous profit. If the homeowner is unable to pay, the lender forecloses and gets the house with equity typically in the tens of thousands of dollars.
"The above conditions have led to many abuses. The primary abuse has been the aggressive marketing of high interest, high prepaid finance charge mortgage loans to tens of thousands of low and moderate income homeowners who are mostly minority, elderly citizens. This practice has continued unabated for at least ten years. The loans typically carry prepaid finance charges ranging from 10 to 35 points and annual interest rates of 18% to 29%. Many of the companies engaging in these practices employ fraud, deception, falsified applications and forged deeds. The mortgages also often contain atrociously high brokers fees,[[7]] padded closing costs, balloon payments which trigger foreclosures, and high prepayment penalties which make refinancing difficult, if not impossible. All too often, foreclosure is the end result. Indeed entities such as Fleet Finance, Inc. have exceedingly high foreclosure rates (at least 10 times higher than the national average). It is thus clear that these lenders focus on the equity in the house, not the ability of the homeowner to repay the loan. Not only do families lose their homes which often represent a lifetime investment, but neighborhoods are destabilized, leading to drugs and crime."
Hearing, op. cit., pp. 66-68.
The discount points and the conduct alleged against UCLC do not rise to the level described in this testimony, but the testimony serves to show the danger of allowing mortgage lenders that are not regulated except by the disclosure and rescission requirements of the Truth-In-Lending Act and RESPA to charge interest rates and discount points with no caps. Because UCLC's Alabama offices are not approved by HUD, they are not regulated by HUD. This fact supports a construction that only mortgagees whose offices in Alabama are approved by HUD are exempted by § 5-19-31 from the provisions of the Mini-Code. Such a construction would allow the points cap of § 5-19-4(g) to apply to such unregulated mortgagees and would provide at least that much protection to mortgagors taking loans from such mortgagees.
As to a broad category of "federally related mortgage loans," see 12 U.S.C. § 1735f-5(b),[8] Congress has enacted as part of the Depository Institutions Deregulation Monetary Control Act (DIDMCA), P.L. 96-221, Mar. 31, 1980, 94 Stat. 132, provisions limiting the application of state usury laws. Id., Title V, § 501, codified at 12 U.S.C. § 1735f-7a (1988). Section 1735f-7a(b)(4), however, *1178 allows states, after March 31, 1980, to limit discount points on federally related mortgage loans.[9]
Section 5-19-4(g) of the Alabama Code was enacted in 1988 and therefore qualifies as an overriding exception to DIDMCA's preemption of state usury laws in regard to federally related mortgage loans. The United States District Court for the Southern District of Alabama has so held, rejecting a claim by this same lender, UCLC, that the points cap of § 5-19-4(g) cannot apply to its mortgage loans because that cap is preempted by DIDMCA. Autrey v. United Companies Lending Corp., 872 F.Supp. 925 (S.D.Ala.1995). The court assumed, without deciding, that UCLC's loan to Autrey was "federally related" and held: "Because [DIDMCA] does not completely pre-empt Plaintiffs' Mini Code claims, which this Court so finds since § 5-19-4(g) qualifies under DIDMCA's [§ 1735f-7a](b)(4) override exception, remand is appropriate." 872 F.Supp. at 928 (emphasis added). Because Congress broadly allowed states to override its preemption of state usury laws as to discount points, we see no reason to limit the override enacted by our legislature in 1988 and codified at § 5-19-4(g).
Thus, we see no rational basis for extending to UCLC's offices in Alabama, which are not approved or regulated branch offices under the NHA approval procedures, the exemption by § 5-19-31(a) of mortgage loans made by NHA-approved mortgagees. There are overwhelming reasons, as described above, for construing that exemption not to apply to branch offices that are not approved to make NHA-insured loans.
The Mini-Code was enacted for consumer protection and so should be construed to effectuate that purpose, see, e.g., Jackson v. CIT Group/Sales Financing, Inc., 630 So.2d 368 (Ala.1993); Spears v. Colonial Bank of Alabama, 514 So.2d 814 (Ala.1987); Edwards v. Alabama Farm Bureau Mut. Cas. Ins. Co., 509 So.2d 232 (Ala.Civ.App. 1986), cert. quashed, 509 So.2d 241 (Ala. 1987); Derico v. Duncan, 410 So.2d 27 (Ala. 1982).
Because the Mini-Code was intended to provide protection to the public by regulating creditors, it should be construed so as to effectuate that public protection. "Statutes intended for the public benefit are to be construed most favorably to the public." St. Paul Fire & Marine Ins. Co. v. Elliott, 545 So.2d 760, 762 (Ala.1989); First Alabama Bank of Dothan v. Renfro, 452 So.2d 464, 467 (Ala.1984); Gant v. Warr, 286 Ala. 387, 391, 240 So.2d 353, 355 (1970); Employers Ins. Co. v. Johnston, 238 Ala. 26, 32, 189 So. 58, 63 (1939).
Furthermore, § 5-19-31(a) provides an exemption from the provisions of the Mini-Code and so should be construed strictly against the party seeking the exemption. Exceptions or provisos, which restrict the operation of a statute, "should be strictly construed, and ... only those subjects expressly restricted should be freed from the operation of the statute," Pace v. Armstrong World Industries, Inc., 578 So.2d 281, 284 (Ala.1991).
These principles favor extending the protection of § 5-19-4(g) to an Alabama mortgagor whose Alabama mortgagee is not regulated under the NHA approval procedures and limiting the exemption in § 5-19-31(a) to mortgagees approved to make NHA loans in Alabama.[10]
*1179 UCLC concedes that it is not approved to make NHA loans in Alabama and that the McGehees' loan is not an NHA-insured loan. Its Mobile, Alabama, office, from which the McGehees' loan originated, is not an NHA-approved branch office, and UCLC does not have a branch office that is approved to make NHA loans in Alabama. We hold, therefore, that UCLC is not "a lending institution which is an approved mortgagee under the provisions of the National Housing Act" for purposes of the exemption provided by § 5-19-31(a), because, as to its operations in Alabama to which the Mini-Code might apply, UCLC is not such an "approved mortgagee." Thus, UCLC is not exempt from the provisions of the Mini-Code and § 5-19-4(g) applies to UCLC's loan to the McGehees. The circuit court correctly entered the partial summary judgment for the McGehees, correctly holding that UCLC is subject to the points cap of § 5-19-4(g), and it correctly denied UCLC's motion for summary judgment on the McGehees' complaint alleging that their loan violates § 5-19-4(g), which allows a creditor to "charge and collect points in an amount not to exceed five percent of the original principal balance."
APPLICATION GRANTED; OPINION WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED.
ALMON, SHORES, KENNEDY, COOK, and BUTTS, JJ., concur.
HOOPER, C.J., and MADDOX and HOUSTON, JJ., dissent.
HOUSTON, Justice (dissenting).
The sole issue raised by the McGehees on their application for rehearing is whether the trial court erred in rejecting an alternative argument allegedly made by them, which they argue supported the partial summary judgment entered for them as to the applicability of the Ala.Code 1975, § 5-19-31(a), exemption; we had reversed that partial summary judgment in our original opinion.[11] The McGehees argue that the trial court properly held that United Companies Lending Corporation (UCLC) was not entitled to a § 5-19-31(a) exemption, because they assert that their rejected alternative argument supports the partial summary judgment. The McGehees argue that the trial court erred in holding that UCLC was "an approved mortgagee under the provisions of the National Housing Act."[12] They concede that UCLC had received approval from the Secretary of Housing and Urban Development to underwrite federally insured loans out of its Baton Rouge, Louisiana, main office, but argue that, because UCLC did not obtain "branch office" approval for its Mobile, Alabama, office from the Mobile field office of the Department of Housing and Urban Development (hereinafter referred to as "HUD"), UCLC is not actually an NHA-approved mortgagee for purposes of § 5-19-31(a).[13] In order to resolve the issue raised by the McGeheeswhether HUD approval to make federally insured loans in Alabama is a prerequisite to obtaining a § 5-19-31(a) exemptionthis Court should have looked to federal law, which clearly establishes that UCLC is a HUD-approved mortgagee regardless of whether it seeks "branch approval" for any of its local offices. Because the majority did not, I must respectfully dissent.
Federal law gives the Secretary of Housing and Urban Development the authority to promulgate regulations governing the approval of lending institutions for participation *1180 as mortgagees in federal mortgage insurance programs:
"The Secretary [of Housing and Urban Development] is authorized, upon application by the mortgagee, to insure as hereinafter provided any mortgage offered to him which is eligible for insurance as hereinafter provided, and, upon such terms as the Secretary may prescribe, to make commitments for the insuring of such mortgages prior to the date of their execution or disbursement thereon."
12 U.S.C. § 1709(a). (Emphasis added.) Furthermore, 12 U.S.C. § 1709(b)(1) states:
"To be eligible for insurance ... a mortgage shall
"(1) Have been made to, and be held by, a mortgagee approved by the Secretary as responsible and able to service the mortgage properly."
In order to fulfill the mandate of § 1709(a) that the Secretary of Housing and Urban Development prescribe terms for "mak[ing prior] commitments for the insuring of ... mortgages," HUD has promulgated regulations setting out the criteria of a federally insurable mortgage and the requirements for being "a mortgagee approved by the Secretary" under 12 U.S.C. § 1709(b)(1).
The regulations pertinent to the issue before uswhether UCLC was "a mortgagee approved by the Secretary," 12 U.S.C. § 1709(b)(1), when it made the McGehee loanare contained in subpart B of part 202 of title 24 of the Code of Federal Regulations. The first pertinent provision is 24 C.F.R. § 202.11(a), which states:
"(a) Approval. (1) A mortgagee may be approved for participation in the mortgage insurance programs authorized by the National Housing Act, except Title I of the Act, upon filing a request for approval on a form prescribed by the Secretary and signed by the applicant. The approval form shall be accompanied by such documentation as may be prescribed by the Secretary to support the request for approval."
The McGehees do not dispute the fact that UCLC filed an application and the necessary accompanying documents, as required by § 202.11(a) before making the McGehee loan.
The additional requirements for being an approved mortgagee for participation in federally insured loan programs are contained in 24 C.F.R. § 202.12:
"To be approved for participation in the mortgage insurance programs authorized by the National Housing Act, except Title I of the Act, and to maintain approval, a mortgagee shall meet the general requirements of this section ... and the specific requirements of § 202.13 through § 202.19, as appropriate.
"(a) Business form. It shall be a corporation or other chartered institution, a permanent organization having succession or a partnership....
". . . .
"(b) Employees. It shall employ competent personnel ... and adequate staff and facilities to originate and service mortgages in accordance with applicable regulations, to the extent the mortgagee engages in such activities.
"(c) Officers. All employees who will sign applications for mortgage insurance on behalf of the mortgagee shall be corporate officers or shall otherwise be authorized to bind the mortgagee....
"(d) Escrows. It shall not use escrow funds for any purpose other than that for which they were received....
"(e) Related laws. It shall comply with the provisions of the Fair Housing Act, Executive Order 11063, Equal Credit Opportunity Act, the Real Estate Settlement Procedures Act of 1974, and all other Federal laws relating to the lending or investing of funds in real estate mortgages.
"(f) Servicing. It shall comply with the servicing responsibilities contained in subpart C of part 203 and in part 207, and with all other applicable regulations....
"(g) Business changes. It shall provide prompt notification ... of all changes in its legal structure....
"(h) Reports. It shall file the following reports, records and documentation:
". . . .

*1181 "(i) Financial statements. It shall, upon request by the Secretary, submit a copy of its latest financial statement, submit such information as the Secretary may request, and submit to an examination of that portion of its records which relates to its insured mortgage activities.
"(j) Quality control plan. It shall implement a written Quality Control Plan ... that assures compliance with the regulations and other issuances of the Secretary....
"(k) Fees. A mortgagee ... shall pay an application fee and annual fees....
"(l) Ineligibility.... [N]either the applicant mortgagee nor any officer, partner, director, principal or employee of the applicant mortgagee shall:
"(1) Be suspended, debarred or otherwise restricted under ... this title, or under similar procedures of any other Federal agency;
"(2) Be indicted for, or have been convicted of, an offense which reflects upon the responsibility, integrity or ability of the mortgagee to be an approved mortgagee;
"(3) Be subject to unresolved findings...; or
"(4) Be engaged in business practices that do not conform to generally accepted practices of prudent mortgagees or that demonstrate irresponsibility.
"(m) Branch offices. It may, only upon approval of the Secretary, maintain branch offices for the submission of applications for mortgage insurance. The mortgagee shall remain fully responsible to the Secretary for the actions of its branch offices.
"(n) Net worth. It shall have and maintain a net worth, in assets acceptable to the Secretary, of the following amounts.
"[The listing of amounts is omitted.]
"(o) Effective date [of the net worth provisions].
"(p) Conflict of interest.... The mortgagee shall not pay a referral fee to any person or organization.
"(q) Liquid assets. It shall maintain liquid assets consisting of cash or its equivalent acceptable to the Secretary in the amount of 20 percent of its net worth, up to a maximum liquidity requirement of $100,000.
"(r) Fidelity bond. ... [T]he mortgagee shall maintain fidelity bond coverage and errors and omissions insurance acceptable to the Secretary and in an amount required by the Secretary...."
Last, because UCLC falls within the § 202.14(a) definition of a "nonsupervised mortgagee," UCLC must, in addition to complying with the above regulations, also comply with additional, more specific rules contained in § 202.14(c) as to the maintenance of warehouse lines of credit and the filing of audit reports.[14]
The McGehees contend that UCLC failed to comply with § 202.12(m) and, therefore, was not "an approved mortgagee under the provisions of the National Housing Act" when it made its loan to them. That subsection states:
"(m) Branch offices. It may, only upon approval of the Secretary, maintain branch offices for the submission of applications for mortgage insurance...."
*1182 The McGehees argue that UCLC's Mobile office was a "branch office" that must have been registered with the HUD field office in Mobile in order to comply with § 202.12. I cannot agree with their contention though, because the plain language of subsection (m) does not require the approval of any lending institution office that does not "submi[t] ... applications [to HUD] for mortgage insurance." It is undisputed that UCLC has never made or underwritten a single federally insured loan out of its Mobile office. Furthermore, subsection (m) is written in permissive language ("may ... maintain [approved] branch offices"). It does not require that UCLC or any other NHA-approved mortgagee open "branch offices" at all.[15]
In the alternative, the McGehees argue that we should construe § 5-19-31(a) to require more than 24 C.F.R. §§ 202.11 and 202.12 require to be an NHA-approved mortgagee. Their argument for the judicial imposition of an additional Alabama approval requirement on mortgagees seeking a § 5-19-31(a) exemption is very similar to the McGehees' argument that we rejected in our original opinionthat this Court should, for the same policy reasons, construe the § 5-19-31(a) exemption to apply only in instances where an NHA-approved mortgagee is actually making a federally insured mortgage. The majority seems to base its opinion on rehearing on the same sort of policy argument:
"Thus, we see no rational basis for extending to UCLC's offices in Alabama, which are not approved or regulated branch offices under the NHA approval procedures, the exemption by § 5-19-31(a) of mortgage loans made by NHA-approved mortgagees."
686 So.2d at 1178. See also note 3. The problem with the reasoning underlying the McGehees' argument and the majority's opinion is that it fails to acknowledge that Alabama courts cannot resort to judicial construction of a statutory provision unless the provision in question is ambiguous.[16] After fully considering the statutory language in question, I cannot conclude that the § 5-19-31(a) phrase "an approved mortgagee under the provisions of the National Housing Act" is ambiguous. That phrase clearly and unambiguously leads the reader to the Federal law, contained in 24 C.F.R. §§ 202.11(a) and 202.12, defining which mortgagees are, and which are not, approved to make NHA federally insured mortgages.
But even if the § 5-19-31(a) phrase "an approved mortgagee under the provisions of the National Housing Act" could be held ambiguous, I could not agree with the majority's contention that this Court should interpret that phrase as requiring NHA-approved mortgagees to seek "branch office" approval in Alabama in order to qualify for a § 5-19-31(a) exemption. "It is a fundamental principle of statutory construction that [a court construing a statute will assume that] in enacting the statute the legislature had full knowledge and information as to prior and existing law ... on the subject of the statute." Miller v. State, 349 So.2d 129, 131 (Ala.Crim.App.1977).[17] "[W]e presume that *1183 the Legislature knows the meaning of the words it uses in enacting legislation." Ex parte Jackson, 614 So.2d 405, 407 (Ala.1993). In construing the phrase in question, this Court must presume that the legislature had full knowledge of the NHA approval procedures contained in the federal regulations. Those regulations, as shown above, provide that a mortgagee that wishes to make federally insured mortgages must first seek HUD approval for its main underwriting office, and that once the mortgagee is approved by the Secretary of HUD it can then seek approval for any other "branch offices" out of which the approved mortgagee intends to underwrite federally insured mortgages.[18] Section 202.12(m) makes it abundantly clear that "branch office" approval is not a requirement for being an NHA-approved mortgagee, but is instead completely optional.[19]
I cannot conclude, from the facts contained in the record, that UCLC failed to satisfy any of the federal requirements found in 24 C.F.R. §§ 202.11, 202.12, or 202.14 for being approved to participate in the mortgage insurance programs authorized by the National Housing Act; therefore, I must dissent, because I am convinced that our initial holdingthat the trial court erred in entering the partial summary judgment in favor of the McGehees as to the issue of the applicability of the Ala.Code 1975, § 5-19-31(a), exemptionwas correct.
HOOPER, C.J., and MADDOX, J., concur.
NOTES
[1] The dissent asserts that this question was not presented to the circuit court. On the contrary, the McGehees' brief in opposition to UCLC's motion for summary judgment made the point that UCLC was not approved to make NHA loans in Alabama: "UCLC's `approval' covers only the New Orleans HUD field office jurisdiction. On October 3, 1990, UCLC received its `approval.'" That brief also states: "UCLC has not applied for branch approval for any of its branches to make HUD and/or National Housing Act loans. It is undisputed that UCLC has not obtained separate HUD approval to originate FHA loans out of its Mobile, Alabama branch." These points are sufficiently set forth in the record to support the circuit court's order.
[2] The McGehees allege that the $133.50 "interim interest" and the $59.50 "tax service fee" that make up the balance of the prepaid finance charges are also points. We express no opinion on whether these items constitute points; if they do, the points in this loan exceed 8.5% of the amount financed.
[3] Before a 1994 amendment, § 5-19-31(a) read: "None of the provisions of this chapter ... shall apply"; this opinion uses the current version because the change is insubstantial. See 1989 Ala. Acts, Act No. 89-541, p. 1132; 1994 Ala. Acts, Act No. 94-118, p. 146.
[4] The dissent quotes other portions of the HUD regulations, but, as we read these regulations, most of them apply only to an approved mortgagee's home office or to approved branch offices. It appears that unapproved branch offices are not supervised by HUD. Thus, approved mortgagees who maintain branch offices but do not seek approval to make NHA loans from those offices apparently may run those offices with no concern for most of the federal regulations. Thus, we are concerned by the dissent's suggestion that a claim based on the activities of such a branch office should be dismissed out of hand on a motion for summary judgment.
[5] The dissent characterizes the language in § 202.12(m) concerning branch office approval as "permissive." The suggestion in footnote 15 of the dissent that such an office could originate NHA loans is contrary to the Federal regulations. However, branch office approval is required before such an office may submit NHA loan applications.
[6] Publication 4060.1, October 1980, with all changes through #3, 12/29/86; this version was in effect when UCLC obtained approval for its home office and when it made the loan to the McGehees.
[7] See Smith v. First Family Financial Services, Inc., 626 So.2d 1266 (Ala.1993), regarding an attempt to avoid the 5% discount point cap of § 5-19-4(g) by not disclosing commissions to mortgage brokers as prepaid finance charges.
[8] An NHA-insured mortgage loan is "federally related" as defined in § 1735f-5(b)(2)(B). Categories (A), (C), and (D) are "federally related" otherwise than by NHA insurance. Category (D) appears to be the broadest, making a loan "federally related" simply because the creditor "makes or invests in residential real estate loans aggregating more than $1,000,000 per year."
[9] 12 U.S.C. § 1735f-7a(b)(2) allowed states to override DIDMCA's preemption of state usury laws by enacting interest rate caps, but only within a narrow time period (1980-83) and only by expressly overriding DIDMCA. 12 U.S.C. § 1735f-7 more broadly allows states to override the usury law preemption that is specific to NHA loans. See Doyle v. Southern Guar. Corp., 795 F.2d 907, 914 (11th Cir.1986), which discusses these override provisions. These provisions are separate from § 1735f-7a(b)(4), discussed in the text, which allows states to override DIDMCA preemption as to caps on discount points simply by enacting a cap on discount points after March 31, 1980. See Autrey v. UCLC, discussed later in the text.
[10] The dissent construes the exemption most favorably to the party seeking exemption. The principle that the legislature is presumed to know the applicable laws and Federal regulations leads us to conclude that the legislature was aware that branch offices in Alabama require separate approval and therefore intended that only such approved branch offices would be exempt, not, as the dissent would conclude, that the legislature intended to exempt all offices opened by mortgagees with NHA approval in some other state, whether or not the offices in this state are approved to make NHA loans.
[11] The issue the majority addresses in its opinion on rehearing was not raised by the McGehees in the trial court. The only issues raised below were addressed in my opinion of March 22, 1996.
[12] In its order granting the partial summary judgment for the McGehees, the trial court stated that "it is undisputed that [UCLC] is an approved mortgagee under the provisions of the National Housing Act."
[13] The pertinent portion of § 5-19-31(a) (as it read before the February 24, 1994, amendment) states:

"None of the provisions of this chapter ... shall apply to any ... mortgage of an interest in real property, where the creditor is a lending institution which is an approved mortgagee under the provisions of the National Housing Act. ..."
(Emphasis added.)
[14] I cannot agree with the following assertion of the majority:

"Because UCLC's Alabama offices are not approved by HUD, they are not regulated by HUD. This fact supports a construction that only mortgagees whose offices in Alabama are approved by HUD are exempted by § 5-19-31 from the provisions of the Mini-Code."
686 So.2d at 1177. The McGehees and all other persons who do business with mortgage companies that are NHA-approved mortgagees do benefit from the regulations contained in 24 C.F.R. §§ 202.12 and 202.14, whether or not the office they deal with is a "branch office" approved under § 202.12(m). These regulations ensure that NHA-approved mortgagee institutions are reputable and financially stable, and, most importantly, that such institutions are capable of answering to the mortgagor if a problem arises (in other words, compliance with these regulations ensures that a mortgagee is not a "fly-by-night" mortgage company). For example, the regulations applicable to all NHA-approved mortgagees require that such mortgagees: follow procedures acceptable in the mortgage industry generally (see § 202.12(l)(4)), have adequate financial resources (see § 202.12(n), (o), and (q)), are insured for errors and omissions (see § 202.12(r)), as well as comply with federal lending and housing laws.
[15] UCLC also argued in its brief that, according to its reading of the regulations, it would not have violated 24 C.F.R. § 202.12(m) for its Mobile office to go as far as to take applications for federally insured mortgages without "branch office" approval, as long as its Mobile office was not participating in the underwriting of federally insured mortgages.
[16] See Hines v. Riverside Chevrolet-Olds, Inc., 655 So.2d 909, 924 (Ala.1994), which states:

"When a statutory pronouncement is clear and not susceptible to different interpretations, it is a paramount judicial duty to abide by that clear pronouncement."
(Citing Macon v. Huntsville Utilities, 613 So.2d 318 (Ala.1992).)
[17] See Holstein v. Norandex, Inc., 194 W.Va. 727, 461 S.E.2d 473, 477 (1995):

"A statute should be so read and applied as to make it accord with the spirit, purposes and objects of the general system of law of which it is intended to form a part; it being presumed that the legislators who drafted and passed it were familiar with all existing law, applicable to the subject matter, whether constitutional, statutory or common, and intended the statute to harmonize completely with the same and aid in the effectuation of the general purpose and design thereof, if its terms are consistent therewith."
(Emphasis added.) (Quoting State ex rel. Goff v. Merrifield, 191 W.Va. 473, 446 S.E.2d 695 (1994), and other cases.) See also Holmes County School Bd. v. Duffell, 651 So.2d 1176 (Fla. 1995); Wilson v. Miles, 218 Ga.App. 806, 463 S.E.2d 381 (1995); Nunnally v. State Dep't of Public Safety, 663 So.2d 254 (La.App.1995); Smith v. Retirement Bd., 656 A.2d 186 (R.I.1995); Still v. First Tennessee Bank, N.A., 900 S.W.2d 282 (Tenn.1995).
[18] For the same reasons, this Court must also presume that the legislature was aware that 24 C.F.R. § 202.11(a)(4) allows the Secretary of HUD to restrict geographically the approval of mortgagees applying under § 202.11(a). Subsection (a)(4) states:

"(4) Approval of mortgagees may be restricted to geographic areas designated by the Secretary or may be approved to operate on a nationwide basis."
Had the legislature intended to restrict the application of Ala.Code 1975, § 5-19-31(a), to NHA-approved mortgagees who have been approved to make federally insured loans in Alabama, the legislature could have easily done so, just as the legislature, if it had so chosen, could have restricted the application of the exemption to federally insured mortgage loans only (an argument rejected in this Court's original opinion). See Ex parte Jackson, 614 So.2d 405, 407 (Ala.1993):
"[W]e presume that the Legislature knows the meaning of the words it uses in enacting legislation.... [I]f it intended [the section in question] to apply in this case, [it] knew how to draft a statute to reach that end.... The judiciary will not add that which the Legislature chose to omit."
(Emphasis added.)
[19] The requirements for being an NHA-approved mortgagee, aside from the § 202.11(a) application requirement, are contained in 24 C.F.R. § 202.12. That section states:

"To be approved for participation in the mortgage insurance programs authorized by the National Housing Act, except Title I of the Act, and to maintain approval, a mortgagee shall meet the general requirements of this section ... and the specific requirements of § 202.13 through § 202.19, as appropriate."
(Emphasis added.) The requirement at issue here is found in subpart (m):
"(m) Branch offices. It may, only upon approval by the Secretary, maintain branch offices for the submission of applications for mortgage insurance. The mortgagee shall remain fully responsible to the Secretary for the actions of its branch offices."