The defendant below, Goldome Credit Corporation, appeals from a summary judgment entered in favor of Selena Burke, the plaintiff/class representative in this class action alleging that Goldome imposed excessive charges on mortgage loans. We reverse and remand.
 Facts and Procedural History
On August 24, 1988, Selena Burke and her daughter, Diane Burke,[2] executed a simple-interest note ("the note") in the amount of $14,101, payable to Horizon Funding, Inc. The note was secured by a mortgage on property owned by Selena. *Page 284 
The note bore interest at a yearly rate of 15.5% and was payable in monthly installments of $202.21 over a nearly 15-year term. It further provided that the borrowers had the right to prepay the principal of the loan in whole or part at any time, without penalty.
A document entitled "itemization of amount financed," which Selena and Diane signed at the closing of the loan, reflected that $560 of the $14,101 was a "prepaid finance charge" paid to Horizon. Additionally, the document reflected in a portion entitled "amount paid to others on your behalf" that $500 was paid to "Martha Chestnut, Broker." Other amounts were also paid to various third parties, including payments for an appraisal, title insurance, a credit report, a "mortgage payoff," and filing fees to "public officials."
Several days after the note was executed, Horizon sold the note to Goldome.[3] Goldome in turn paid Horizon the face amount of the note plus an additional sum of $530.44 (hereinafter referred to as the "yield spread premium"). According to the record, the yield spread premium due Horizon actually totaled $707.26. However, Goldome deducted a "25% reserve," and Horizon apparently received a reduced amount of $530.44 as the yield spread premium.[4]
Diane made payments on the note and ultimately prepaid the note in full before the end of its term. It is undisputed that Selena never made a payment on the note.
On October 13, 1994, after the note had been paid in full, Selena sued Horizon, Goldome, and fictitiously named defendants, alleging causes of action based on fraud, suppression, conspiracy, breach of fiduciary duty, and violations of Alabama's "Mini-Code," Ala. Code 1975, § 5-19-1 et seq.[5] The complaint states, in part:
 "1. On or about August 24, 1988 the plaintiff obtained a second mortgage loan on certain property in Lowndes County, Alabama through the defendant Horizon Funding, Inc. (`Horizon'). In arranging this loan, Horizon was acting as the agent of defendant Goldome Credit Corporation (`Goldome'), which was the actual lender. Goldome reviewed and approved the plaintiff's loan documents before making the loan. . . .
 "2. In connection with the loan the plaintiff was required to pay $500.00 for a broker's fee, which was included in the principal amount of the loan as shown in the attached Exhibit A. . . .
 "3. In fact, the broker's fee was an additional finance charge in the nature of points or other front-end charge, which was a material fact that the defendants misrepresented and/or suppressed in connection with the loan. . . .
 "4. As a result of the defendants' misrepresentation and/or suppression of the nature of the brokers' fee, the defendants also misrepresented the true interest rate and finance charge on the plaintiff's loan.
 "5. In reliance upon the misrepresentation and/or suppression of the defendants, the plaintiff entered into the loan. As a result the plaintiff has been injured and damaged by paying more in *Page 285 
interest and finance charges than she was told by the defendants."
Additionally, the complaint sought certification of the action as a class action.
After initial discovery, Selena amended the complaint on November 7, 1995, to add a claim specifically alleging that Horizon and Goldome had violated Ala. Code 1975, §5-19-4(g).[6] The amendment alleged that the yield spread premium, the $560 "prepaid finance charge," and the $500 fee to Chestnut were actually "points" and that they exceeded the limitation on points found at the time in Ala. Code 1975, §5-19-4(g).
Selena later moved the trial court to certify the action as a class action. In an order dated May 6, 1998, the trial court certified the action under Rule 23(b)(3), Ala. R. Civ. P., as a class action with three subclasses. The first two subclasses were based on the fraud and suppression claims; however, the trial court later vacated its certification of those two subclasses, leaving one remaining class, which the trial court described in its certification order as follows:
 "The total of the $500.00 broker fee and $560.00 `Prepaid Finance Charge' stated on Exhibit A, and the $707.26 [yield spread premium] to the broker shown on Exhibits B and C, Plaintiff's Brief Supporting Class Certification, is $1,767.60 [sic]. Plaintiff alleges that these charges are `points' within the meaning of, and subject to the limitation of, Sec. 5-19-4(g), Code of Alabama.
". . . .
 "In Ms. Burke's case, the $1,767.60 total of yield spread premium, broker fee, and prepaid finance charge equals 13.05%, of the stated Amount Financed ($13,541.00). . . .
 "The second amendment to the complaint alleges that the total broker's fee, [yield spread premium,] and prepaid finance charge exceed the 5% maximum on points allowed by Sec. 5-19-4(g), Code of Alabama, and that all these payments are `finance charges' under Sec. 5-19-1(1) which says:
 "`(1) Finance charge. The sum of all charges, payable directly or indirectly by the person to whom credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit. . . .'
 "The Alabama Supreme Court has held that a yield spread premium is a prepaid finance charge, and that all such charges are `points' within the 5% cap of Sec. 5-19-4(g). In Smith v. First Family Financial Services, Inc., 626 So.2d 1266 (Ala. 1993) the Court said[:]
 "`The Mini-Code (Sec.15-19-1(1)) defines "finance charge" as including all charges "imposed directly or indirectly," including points or other charges, "however denominated."
 "`. . . . Alabama Code 1975, Sec. 5-19-4(g), provides:
 "`"(g) Notwithstanding the provisions of this or any other section of this chapter, a creditor may, pursuant to contract, in a consumer loan or consumer credit sale secured by an interest in real property, charge and collect points in an amount not to exceed five percent of the original principal balance in the case of a closed-end loan or credit sale, . . ."
 "`. . . 5-19-1(1) defines "finance charge" as including every charge imposed on the consumer whether "directly or indirectly," by whatever designation. Section 5-19-4(g) merely *Page 286 
states that, for purposes of computing a finance charge refund, points, being fully earned on the date of the loan, may be excluded.
 "`That this is so does not change the nature of the spread yield [sic] premium. It is a part of the origination loan fee paid to the mortgage broker on the front end of the loan. It is a cost of borrowing money, defined as a "finance charge" under the Mini-Code.'
"626 So.2d at 1271 (emphasis added).
". . . .
 "Plaintiff alleges that Smith . . . hold[s] any up-front fees to a lender or broker are `points,' and that Goldome's `yield spread premiums' to brokers were `prepaid finance charges' and `points,' which along with broker fees were subject to the 5% limit of Sec. 5-19-4(g).
 "Plaintiff's revised motion for class certification requests certification of the following subclass No. 3:
 "3. All Alabama residents who received any loan from Goldome Credit Corporation after June 30, 1988, which was arranged through any loan broker, and in which the total of broker's fees, yield spread premium, and/or other prepaid finance charges paid to the broker by Goldome exceeded 5% (five percent) of the original principal balance of the loan."
On May 15, 1998, Selena, as class representative, filed a motion for a partial summary judgment on her claim that Goldome had violated the five percent limitation on points found in §5-19-4(g). Goldome filed its own motion for a summary judgment on November 16, 1998. On October 19, 1999, the trial court entered a partial summary judgment in favor of the class. Specifically, the trial court held:
 "(a) Summary judgment on the issue of liability is hereby entered in favor of the class and against [Goldome] . . . as to each loan in the class having prepaid finance charges, broker fees and/or yield spread premiums totaling more than 5% of the original principal balance. The Court finds that each such loan was made in violation of [Ala. Code 1975, § 5-19-4(g)].
 "(b) Pursuant to the applicable provisions of [§ 5-19-19], and United Companies Lending Corp. v. Autrey, 723 So.2d 617 (Ala. 1998), each member of the plaintiff class whose loan carries prepaid finance charges, broker fees and/or yield spread premiums totaling more than 5% of the original principal balance is entitled to recover from Goldome Credit Corporation . . . the total finance charge on each such loan. . . .
 "2. As to Goldome's motion for summary judgment: Summary judgment is granted in favor of Goldome solely on the issue of whether its violation of Sec. 5-19-4(g) was `. . . in deliberate violation of or in reckless disregard' of the law, and Goldome's motion is denied in all other respects."
Goldome filed a motion asking the trial court to certify an interlocutory appeal pursuant to Rule 5, Ala. R.App. P. The trial court denied the motion. Goldome then filed a petition for writ of mandamus with this Court, seeking a writ directing the trial court to vacate its October 19, 1999, summary judgment, and to enter summary judgment in Goldome's favor. We denied the petition by order on July 21, 2000.
On December 18, 2001, the trial court, upon the joint agreement of the parties, dismissed Selena's remaining claims. On February 14, 2003, the trial court entered an order it entitled a "RULE 54(b) FINAL JUDGMENT" (capitalization in original). In its order, the trial court modified *Page 287 
its previous partial summary judgment. First, the trial court excluded from the class those borrowers whose loans were "paid off" before October 13, 1993, because the claims of those borrowers were barred by the statute of limitations. Additionally, Goldome was to refund the finance charges found in the loans of each remaining class member, including all prepaid finance charges, loan broker fees, yield spread premiums, and interest. The money would be placed in an account pending a distribution order by the trial court and an award of attorney fees. Finally, the trial court purported to certify its judgment against Goldome as a final judgment pursuant to Rule 54(b), Ala. R. Civ. P. Goldome appeals.
 Standard of Review
"`We review this case de novo, applying the oft-stated principles governing appellate review of a trial court's grant or denial of a summary judgment motion:
 "`"We apply the same standard of review the trial court used in determining whether the evidence presented to the trial court created a genuine issue of material fact. Once a party moving for a summary judgment establishes that no genuine issue of material fact exists, the burden shifts to the nonmovant to present substantial evidence creating a genuine issue of material fact. `Substantial evidence' is `evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' In reviewing a summary judgment, we view the evidence in the light most favorable to the nonmovant and entertain such reasonable inferences as the jury would have been free to draw.'"
 "American Liberty Ins. Co. v. AmSouth Bank, 825 So.2d 786, 790 (Ala. 2002) (quoting Nationwide Prop. Cas. Ins. Co. v. DPF Architects, P.C., 792 So.2d 369, 372 (Ala. 2000) (citations omitted))."
General Motors Corp. v. Kilgore, 853 So.2d 171, 173 (Ala. 2002). Rulings on questions of law carry no presumption of correctness and are also reviewed de novo. Ex parte Graham,702 So.2d 1215, 1221 (Ala. 1997).
 Discussion I.
Goldome argues on appeal that the yield spread premium imposed in this case does not meet the statutory definition of a "point" for purposes of Ala. Code 1975, § 5-19-4(g). At the time of this transaction, that Code section provided:
 "(g) Notwithstanding the provisions of this or any other section of this chapter, a creditor may, pursuant to contract, in a consumer loan or consumer credit sale secured by an interest in real property, charge and collect points in an amount not to exceed five percent of the original principal balance in the case of a closed-end loan or credit sale, or five percent of the total line of credit in the case of an open-end credit plan. Points may be paid in cash at the time of the loan or credit sale, or may be deducted from the proceeds and included in the original principal balance. Points shall be in addition to all other charges and are fully earned on the date of the loan or credit sale and may be excluded from the finance charge for the purpose of computing the finance charge refund."
Goldome further argues that the portions of Smith v. FirstFamily Financial Services, Inc., 626 So.2d 1266 (Ala. 1993), relied upon by Selena and the trial court are not soundly reasoned and that Smith should be overruled to the extent it stands *Page 288 
for the proposition that the yield spread premium in this case is a "point."
In Smith, the plaintiff borrowers, Smith and White, negotiated a loan with EquiSouth, a mortgage broker. EquiSouth was enrolled in a "correspondence lending program" with First Family, a mortgage lender, in which EquiSouth would do all of the "origination work" on loans and then submit the borrowers' loan applications to First Family. If First Family approved the applications, the loans were closed in the name of EquiSouth, and the funds were supplied by First Family. 626 So.2d at 1269.
EquiSouth submitted Smith's loan application to First Family, which initially refused the loan on the basis of the application. Smith's brother, White, agreed to cosign the note and loan application. First Family then issued a conditional loan commitment, which provided that First Family would lend the money to Smith and White at an interest rate of 16% per annum. EquiSouth then added an additional 2% interest as a "mortgage broker origination fee," increasing the total interest rate to 18%. 626 So.2d at 1269. First Family would then pay 75% of the present-value calculation of the 2% interest to EquiSouth as compensation for "originating" the loan, and retain the remaining 25%. This payment to EquiSouth was referred to as a "yield spread premium." 626 So.2d at 1270. As part of the transaction, Smith and White also paid an "origination fee" of 5% of the loan.626 So.2d at 1269.
Smith and White subsequently sued First Family, claiming that it had a duty to disclose to them the existence of the yield spread premium. This Court agreed, holding that although the "origination fee" and the resulting 18% interest rate had been disclosed to Smith and White, the yield spread premium had not, and First Family had a duty to disclose the existence of the yield spread premium. Smith, 626 So.2d at 1272.
Smith and White also claimed that the yield spread premium violated the limitation on points then found in Ala. Code 1975, §5-19-4(g). That Code section, the Court stated, was enacted to limit "origination fees":
 "On March 11, 198[8], Act No. 88-87 was approved, with an effective date of June 30, 1988. Act No. 88-87 amended § 5-19-4, part of the Alabama Consumer Credit Act (`Mini-Code'), to provide for a five percent limitation on mortgage loan origination fees. The provision is codified at Alabama Code 1975, § 5-19-4(g), as amended."
626 So.2d at 1270 (emphasis added). The Court then appeared to imply that the yield spread premium in that case was a "point" as that term is used in § 5-19-4(g), reasoning that finance charges and origination fees encompass both the yield spread premium and points:
 "The plaintiffs claim that, a few months after the effective date of § 5-19-4(g), First Family implemented its correspondent lender program with the aim of permitting a mortgage broker participating in the correspondent lender program to receive fees for originating a consumer loan substantially in excess of the five percent limitation. The plaintiffs argue that this was done through means of the yield spread premium, which resulted in the mortgage broker's receiving more than a five per cent origination fee. . . . First Family allows a broker participating in the correspondent program to increase the interest rate that the borrower will be charged for origination of the loan through means of spread of up to two percent of the gross amount of the loan. In this instance, it allowed EquiSouth to increase the rate quoted to the borrower *Page 289 
from 16% to 18%. The spread stems from the two percentage-point difference between First Family's 16% `buy rate' and the 18% rate on the note. Under the correspondent lender program, First Family pays 75% of the present value calculation of the spread to the correspondent lender (EquiSouth) at the time the loan is purchased. The other 25% of the spread is retained by First Family. . . .
 "First Family and EquiSouth do not dispute the fact that an origination fee of 5% of the loan plus $2,880.22 (75% of the spread paid to EquiSouth) was charged and paid for by the borrowers at the loan closing. They do not dispute that the transaction is a consumer loan transaction governed by the Mini-Code. The Mini-Code (§ 5-19-1(1)) defines `finance charge' as including all charges `imposed directly or indirectly,' including points or other charges, `however denominated.'
". . . .
 "The defendants, understandably, do not challenge the plaintiffs' assertion that the five percent origination fee and the two percent yield spread premium were finance charges as defined in the Mini-Code, being, as they are, charges imposed directly on the borrower, including points and all other charges, `however denominated.' They contend, however, that the key language in the statute is the phase `fully earned.' They argue, implausibly, that because the statute states that points are fully earned (from the standpoint of the mortgage broker) and may be excluded from the finance charge for the purpose of computing the finance charge refund, the spread yield premium should not be considered points or finance charges since it would not be included in computing a finance charge refund in the event the loan was paid off prematurely.
 "The statutory definition of points, in § 5-19-4(g), does not require that they be `fully earned on the date of the loan' as this argument contends. To the contrary, § 5-19-1(1) defines `finance charge' as including every charge imposed on the consumer whether `directly or indirectly,' by whatever designation. Section 5-19-4(g) merely states that, for purposes of computing a finance charge refund, points, being fully earned on the date of the loan, may be excluded.
 "That this is so does not change the nature of the spread yield premium. It is a part of the origination loan fee paid to the mortgage broker on the front end of the loan. It is a cost of borrowing money, defined as a `finance charge' under the Mini-Code."
Smith, 626 So.2d at 1270-71 (emphasis omitted; emphasis added).
The legislature immediately moved to amend the Mini-Code as a direct result of Smith. In Act No. 94-115, § 1(6), Ala. Acts 1994, the legislature, in its findings, noted that "[b]ecause of pending litigation, see, Smith v. First Family FinancialServices, Inc., 626 So.2d 1266 (Ala. 1993), . . . uncertainty exists as to whether the Mini-Code requires separate disclosure of finance charges such as `yield spread premiums.' . . ." An "objective" of Act No. 94-115, the legislature stated, was to "remove this uncertainty." The entire Mini-Code was later substantially revised in 1996. See Act No. 96-576, Ala. Acts 1996.[7]
Relying on the statement in Smith that § 5-19-4(g) placed a "five percent limitation *Page 290 
on mortgage loan origination fees," the description in that case of the yield spread premium as an "origination fee,"626 So.2d at 1270, and the statement in Smith that both points and yield spread premiums were finance charges the Mini-Code was intended to regulate, the trial court in the instant case concluded that the yield spread premium Goldome paid Horizon constituted a point under § 5-19-4(g).
On appeal, Goldome argues that Smith merely held that the yield spread premium in that case was a finance charge that First Family was required to disclose, not that it constituted "points" for purposes of § 5-19-4(g). Goldome contends that, at best,Smith held only that "nonrefundable" or "prepaid" fees were "points" under 5-19-4(g). Goldome notes the following language from Smith:
 "First Family argues that it was free to charge the plaintiffs any rate of interest that did not violate the usury laws, and that there is no allegation of a usury law violation in this case. We agree with this contention. However, the fact that this is so did not relieve First Family or EquiSouth from disclosing to the borrowers the actual finance charges they were undertaking. The Mini-Code was subject to several amendments in the 1988 session of the legislature. `Finance charge' was broadly defined to include all charges, `however denominated.' Section 5-19-4(g) permitted a creditor, by contract, in a consumer loan secured by an interest in real property, to charge and collect points in an amount not to exceed five percent of the original principal balance. The new legislation provided that such fees were fully earned on the date of the loan, that is, were nonrefundable, and were not to be included in computing finance charge refunds. This settled the debate with regard to whether origination fees were legal under the Mini-Code and settled the question with respect to whether prepaid origination fees could legally be made nonrefundable. The amendment did not, however, relieve the lender of the obligation to disclose all finance charges, including points, to the borrower."
626 So.2d at 1271-72 (emphasis added). The yield spread premium in the instant case, Goldome maintains, was not a "nonrefundable" or "prepaid" origination fee and thus was not "points."
Admittedly, this Court's decision in Smith is less than clear as to whether or how a yield spread premium could be considered "points" under § 5-19-4(g). Smith appears to hold, without specifying authority for its holding, that § 5-19-4(g), as it read when Smith was decided, places a limitation on what it described as "mortgage loan origination fees." Smith,626 So.2d at 1270. The opinion later states that both points and the yield spread premium were origination fees and finance charges.626 So.2d at 1271. But then the opinion states — in the passage cited above by Goldome — that points were "nonrefundable" and "prepaid" origination fees under § 5-19-4(g). 626 So.2d at 1272. Finally, although the opinion does not explicitly state that the yield spread premium, in combination with the five percent origination fee, exceeded the limitations on points then found in §5-19-4(g), the opinion does conclude that questions of fact existed as to whether "First Family and EquiSouth had a duty to disclose overcharge on points," thus implicitly holding that §5-19-4(g) had been violated. 626 So.2d at 1272 (emphasis added).
The plain language of § 5-19-4(g) is explicit: Points are "charge[d] and collect[ed]" by the creditor, are "paid in cash at the time of the loan or credit sale . . . [or] deducted from the proceeds and included *Page 291 
in the original principal balance." Furthermore, points are in "addition to all other charges," "are fully earned on the date of the loan," and "may be excluded from the finance charge for the purpose of computing the finance charge refund."
The yield spread premium Goldome paid to Horizon in this case differs from the "points" described in § 5-19-4(g).[8]
Specifically, it was not charged to or collected from the borrower, "pursuant to contract." Instead, it was paid by Goldome to Horizon.
Selena contends, conversely, that the borrower should be deemed to be the person who pays the yield spread premium because Goldome would have eventually collected it from the borrower during the full course of the term of the loan. A portion of each monthly interest payment, Selena argues, also paid a portion of the yield spread premium, because it was part of the interest on the note. However, we note that under § 5-19-4(g), points are "in addition to all other charges and are fully earned on the date of the loan. . . ." Because points are "in addition to all other charges," it is inconsistent to conclude that they are actually part of the agreed-upon interest rate.
Additionally, the yield spread premium in this case cannot be considered "fully earned on the date of the loan." Section5-19-4(g) deals with charges by the creditor "pursuant to contract, in a consumer loan." The yield spread premium was not "fully earned" by Goldome from the borrower at the date of the loan; indeed, because the note in Selena's case was prepaid, Goldome did not receive the full interest amount contemplated by the full term of the loan. If one accepts Selena's argument that she paid part of the yield spread premium with each interest payment, then Goldome did not receive from Selena full payment of the yield spread premium. In fact, if Selena's loan had been prepaid immediately after it was assigned to Goldome, then Goldome would have had no way at all to recoup the sum it paid as a yield spread premium because, according to Selena, it was part of the interest. Of course, the premium may have been "fully earned" by Horizon — albeit not fully paid, as Goldome only tendered 75% — but § 5-19-4(g) regulates the charges between the creditor and the borrower pursuant to the contract, and not charges between creditors.[9] Thus, the yield spread premium was not "fully earned" by either Horizon or Goldome.
Moreover, the provision in § 5-19-4(g) that points "are fully earned on the date of the loan or credit sale and may be excluded from the finance charge for the purpose of computing the finance charge refund" must be viewed in light of Ala. Code 1975, §5-19-4(c), which allows a borrower to prepay a loan.[10]
Under § 5-19-4(c), the *Page 292 
creditor must refund or credit certain portions of the finance charges due the debtor when a debt is paid. Section 5-19-4(g), however, allows points to be excluded from this refund.
If a yield spread premium constitutes points, as Selena argues, then, under § 5-19-4(c), a debtor would not be entitled to a refund or credit of the yield spread premium when the note is prepaid. This was clearly not the case with the yield spread premium at issue here. Selena, according to her argument, paid portions of the yield spread premium when she paid the interest on the note. If the note had been immediately prepaid, Goldome would have had no way to collect the yield spread premium from Selena, because it was allegedly part of the interest payment.
Selena argues that this Court's decisions in Ex parte Watley,708 So.2d 890 (Ala. 1997); and United Cos. Lending Corp. v.McGehee, 686 So.2d 1171 (Ala. 1996), reaffirm the holding ofSmith that would require that the yield spread premium be considered points for purposes of § 5-19-4(g).[11] However, neither of the these decisions involved yield spread premiums or even a determination of whether a finance charge constituted a point. Watley involved the issue whether Ala. Code 1975, §8-8-5(a), exempted loans of $2,000 or more from the five percent points limitation of § 5-19-4(g). McGehee simply determined whether the Mini-Code exempted a particular creditor from regulation. While Watley and McGehee generally discuss "points" under § 5-19-4(g), both decisions describe "points" as either "nonrefundable" or "prepaid." See Watley,708 So.2d at 894; McGehee, 686 So.2d at 1172. Goldome argues that these cases actually support its argument that the yield spread premium it paid Horizon did not constitute points because, as noted above, a borrower would not be required to pay the full amount of the yield spread premium if the note was prepaid.
Selena argues that the doctrine of stare decisis compels this Court to uphold and follow Smith. Stare decisis is "[t]he doctrine of precedent, under which it is necessary for a court to follow earlier judicial decisions when the same points arise again in litigation." Black's Law Dictionary 1443 (8th ed. 2004). Stare decisis exists for the purpose of bringing predictability and stability to the law, "even when [the court is] enticed to embrace what appears to be a more logically sound rule." Keck v. Dryvit Sys., Inc., 830 So.2d 1, 7-8 (Ala. 2002). Stare decisis, however, "is a golden rule, not an iron rule." Exparte Nice, 407 So.2d 874, 883 (Ala. 1981) (Jones, J., dissenting). At times "this Court has had to recognize . . . that it is necessary and prudent to admit prior mistakes and to take the steps necessary to ensure that we foster a system of justice that is manageable and that is fair to all concerned." ForemostIns. Co. v. Parham, 693 So.2d 409, 421 (Ala. 1997). As Justice Maddox has stated: "[W]hile we accord `due regard to the principle of stare decisis,' it is also this Court's duty `to overrule prior decisions when we are convinced beyond . . . doubt that such decisions were wrong when decided or that time has [effected] such change as to require a change in the law.'" Exparte State Farm Fire Cas. Co., 764 So.2d 543, 545-46 (Ala. 2000) (emphasis added) *Page 293 
(quoting Beasley v. Bozeman, 294 Ala. 288, 291, 315 So.2d 570,572 (1975) (Jones, J., concurring specially)). See also Ex parteMelof, 735 So.2d 1172, 1186 (Ala. 1999) ("`"courts are not bound by stare decisis to follow a previous interpretation [that is] later found to be erroneous"'" (quoting Goodyear Tire RubberCo. v. J.M. Tull Metals Co., 629 So.2d 633, 638 (Ala. 1993), quoting in turn 2B Norman J. Singer, Sutherland StatutoryConstruction § 49.05 at 16 (5th ed. 1992))).
Even assuming that the yield spread premium in this case is an "origination fee," it is not clear how under Smith it should also be considered points for purposes of § 5-19-4(g). Indeed, it is clearly not a point under the plain language of that Code section. Therefore, the trial court erred in holding that the yield spread premium in this case was a point for purposes of calculating the five percent limitation on points found in §5-19-4(g). To the extent that Smith holds that the yield spread premium constitutes "points" for purposes of Ala. Code 1975, §5-19-4(g), it is overruled.
 II.
Goldome also argues that the $500 fee paid to Martha Chestnut as a "broker" does not constitute points under § 5-19-4(g). Goldome asserts that Chestnut was not affiliated with or an agent of either Horizon or Goldome; instead, Chestnut was hired independently by Selena and Diane to find a loan for them. Apparently, Chestnut was a schoolteacher and a friend of Selena's who told Selena about Horizon. Goldome maintains that Chestnut was a third party to the transaction and that neither it nor Horizon required her services. At best, Goldome argues, Chestnut acted as a "finder" on Selena and Diane's behalf, and not as a broker.
Section 5-19-4(g) states that "points" are charged and collected by the "creditor." "Creditor," at the time of this transaction, was defined in Ala. Code 1975, § 5-19-1(3), in pertinent part as those "who regularly extend or arrange for the extension of credit for which the payment of a finance charge is required." Selena does not address Goldome's arguments regarding Chestnut in her brief on appeal, and she cites no evidence in the record establishing Chestnut's role in the transaction or as an agent of Horizon or Goldome. Because there is no evidence indicating that Chestnut was a creditor under § 5-19-4(g) or that she was an agent of Horizon or Goldome, the trial court erred in holding that the $500 paid to her constituted points for purposes of § 5-19-4(g).
 Conclusion
Because we hold that the trial court erred in determining that the yield spread premium and the fee paid to Chestnut were "points" for purposes of § 5-19-4(g), we pretermit discussion of the remaining issues raised by Goldome on appeal. The trial court's summary judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
NABERS, C.J., and SEE, LYONS, HARWOOD, WOODALL, STUART, BOLIN, and PARKER, JJ., concur.
[2] Diane Burke's name also appears as "Arnetta Diane Burke" in portions of the record.
[3] The record indicates that Horizon originally sold the note to "Fleet Financial" but that it was returned to Horizon and was ultimately sold to Goldome.
[4] The yield spread premium, however, is frequently referred to in the record as being in the amount of $707.26.
[5] According to Goldome, Horizon was not served with a summons or the complaint and never appeared as a party to the action.
[6] Unless otherwise specified, we refer to Ala. Code 1975, §5-19-4(g), as it read before it was amended by Act No. 94-115, Ala. Acts 1994, and Act No. 96-576, Ala. Acts 1996.
[7] Because the Mini-Code was revised by Act No. 94-115, Ala. Acts 1994, and Act No. 96-576, Ala. Acts 1996, the current operation of Smith is limited. However, Smith applies to facts of this case, because it interpreted the Mini-Code as it existed when Selena executed the note and when this action was filed.
[8] A "point" is defined by Black's Law Dictionary as: "[o]ne percent of the face value of a loan (esp. a mortgage loan), paid up front to the lender as a service charge or placement fee. . . ." Black's Law Dictionary 1195 (8th ed. 2004). Goldome asserts that the traditional industry usage of the term "point" is consistent with the definition of "point" in Black's and with §5-19-4(g): a point is a one-time fee paid by the borrower in cash or from the proceeds of the loan by adding the amount to the amount financed.
[9] As noted in Smith, a yield spread premium is a "finance charge" under the Mini-Code. Alabama Code 1975, § 5-19-1(1), generally defined a finance charge as a charge payable by thedebtor — in this case, Selena — and imposed by the creditor
as an incident to the extension of credit to the debtor. Smith,626 So.2d at 1271.
[10] Alabama Code 1975, § 5-19-4(c), states, and stated at the time of this transaction, in pertinent part: "(c) . . . [W]hen any debt is paid in full before the final scheduled payment date, the debtor may do so without penalty, and the creditor shall refund or credit the debtor with not less than that portion of the finance charge which shall be due the debtor. . . ."
[11] Selena also argues that this Court reaffirmed Smith inUnited Cos. Lending Corp. v. Autrey, 723 So.2d 617 (Ala. 1998); however, only four of the eight Justices voting concurred inAutrey and thus that opinion is not precedent. *Page 294